530 A.2d 743

Gregory JONES

v.

STATE of Maryland.

Nos. 72, 122, Sept. Term, 1985.

Court of Appeals of Maryland.

Sept. 16, 1987.

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender and George E. Burns, Jr., Asst. Public Defender, on brief), Baltimore, for appellant.

Valerie J. Smith, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Before MURPHY, C.J., and SMITH,* ELDRIDGE, COLE, RODOWSKY, COUCH * and McAULIFFE, JJ.

---

* SMITH, J. and COUCH, J., now retired, participated in the hearing and conference of this case while active members of this Court; after

**574**

MURPHY, Chief Judge.

Gregory Jones was charged in the Circuit Court for Baltimore County with the first degree murder of Charles Jordan; the first degree murder of Lisa Brown; attempted murder of, and assault with intent to murder, Linda Jordan; robbery with a deadly weapon; and use of a handgun in the commission of a crime of violence. The State gave timely notice of its intention to seek the death penalty for the first degree murders.

At a jury trial before Judge James S. Sfekas, evidence was adduced that at 1:15 a.m. on October 20, 1984, two men gained entry to the Jordans' residence, handcuffed Charles Jordan to his eighteen-year-old stepdaughter, Lisa Brown, and caused them to lie on the floor. The men also handcuffed Mrs. Jordan's hands behind her and made her kneel. At this point, Jones entered the Jordans' house and demanded drugs and money. Referring to Jones as "Greg", Charles Jordan asked him why he was "doing this", to which Jones said: "I'm tired of people fucking over me." After Jones took four pieces of jewelry from Mrs. Jordan, he fired two shots through a pillow into the back of Charles Jordan's head, killing him. In the same manner, Jones murdered Lisa Brown. He also fired two shots through a pillow into Linda Jordan's head, after which Jones and his two companions left the Jordans' residence.

Upon realizing that she had only been wounded, and could move, Mrs. Jordan attempted unsuccessfully to telephone for help. Thereafter she decided to leave her residence and seek the assistance of neighbors. As she opened her front door, she again encountered Jones, who was attempting to reenter the premises. Mrs. Jordan slammed and locked the front door. Subsequently, shots were fired at her through the back glass door, striking her in the leg. She fell to the floor and remained still for several minutes,

---

being recalled pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

after which she left her home and called police by phoning from an unoccupied nearby residence.

Mrs. Jordan testified that she knew Jones as an acquaintance of her husband. Although asked by the police at the time of the crimes whether she could identify the murderer, she initially gave only a vague and sketchy description of him; she did not then name Jones as the perpetrator of the offenses. She testified that she did not immediately identify Jones because she wanted first to determine the condition of her husband and daughter. Upon learning of their deaths, Mrs. Jordan called the police to her hospital room where she identified Jones by name as the killer.

Other corroborative evidence was adduced linking Jones to the murders. Jones did not testify in his own behalf; his defense was that he was not present and was not involved in the crimes. The jury convicted him of all counts and subsequently, at a separate sentencing hearing, imposed the death penalty for the two first degree murders.

I

■ Jones contends that the trial court erred when, at a pretrial hearing to suppress Mrs. Jordan's extrajudicial photographic identification of him, it refused to permit inquiry into whether she "was under the influence of alcohol or drugs at the time of the offenses." No claim is made that, at trial, Jones was prevented from cross-examining Mrs. Jordan with respect to her use of such substances at the time of the crimes.

The record discloses that two days after the crimes were committed, while Mrs. Jordan was in the hospital, she was shown an array of six photographs, including one of Jones. She selected Jones's photograph within five seconds of its being shown to her. She stated that she was positive that Jones was the murderer.

Jones's motion to suppress the photographic identification was based on the argument that it was "so impermissibly suggestive as to give rise to a very substantial likelihood of

irreparable misidentification" and, therefore, should be suppressed. Defense counsel extensively interrogated Mrs. Jordan at the pretrial hearing concerning the crimes and her subsequent identification of Jones. Even though she answered a number of questions calculated to test her powers of observation and recognition, the court sustained the State's objection to the question whether Mrs. Jordan had taken drugs or imbibed alcohol on the night of the murders.

In denying Jones's motion to suppress, the trial court concluded that there was nothing suggestive in the photographic array or in the manner in which the police conducted the photographic identification session at the hospital. It emphasized the reliability of the identification, noting that Mrs. Jordan had an excellent opportunity to observe the assailants and that the photographic identification occurred only two days after the crimes were committed. The court concluded that the identification involved no violation of due process, and that it was for the jury at trial to determine the weight to be accorded to the extrajudicial identification.

Before us, Jones does not assail the composition of the photographic array or the conduct of the photographic identification session. Nor does he take issue with the trial court's conclusion that the extrajudicial identification procedure was not suggestive. He now argues that the primary issue at the suppression hearing was the reliability of Mrs. Jordan's photographic identification, with her credibility constituting an important subsidiary issue. In this regard, Jones points out that Charles Jordan had cocaine in his system at the time he was killed; that Charles was a narcotics dealer; and that $14,000 in cash from narcotics transactions was found in Charles's bedroom, part of which Mrs. Jordan claimed as her own.

As Jones's suppression motion was clearly based on a claim of impermissible suggestiveness, the issue to be considered is whether the excluded question had any relevance in establishing this claim. We think it did not.

The Supreme Court has frequently examined the scope of due process protection against evidence derived from suggestive, out-of-court identification procedures. *E.g., Watkins v. Sowders*, 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981); *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). "[D]ue process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Moore v. Illinois*, 434 U.S. 220, 227, 98 S.Ct. 458, 464, 54 L.Ed.2d 424 (1977), quoted in *Webster v. State*, 299 Md. 581, 599–600, 474 A.2d 1305 (1984).

In *Webster*, we reviewed the law pertaining to suggestive pretrial identifications, noting that the cases establish a two-stage inquiry for due process challenges to extrajudicial identifications. *Accord Evans v. State*, 304 Md. 487, 498, 499 A.2d 1261 (1985). The first question is whether the identification procedure was impermissibly suggestive. *Evans, supra*, 304 Md. at 498, 499 A.2d 1261. "Suggestiveness" exists where "[i]n effect, the police repeatedly said to the witness, '*This* is the man.'" *Foster v. California, supra*, 394 U.S. at 443, 89 S.Ct. at 1129 (emphasis in original). If the out-of-court identification was not made under suggestive circumstances, the due process inquiry ends: both judicial and extrajudicial identification evidence is admissible. *Webster, supra*, 299 Md. at 620, 474 A.2d 1305 (determination that lineup was in no way suggestive is dispositive of due process claim).

If, on the other hand, the identification was tainted by suggestiveness, the inquiry progresses to the second stage. Here, the court assesses whether, under the totality of circumstances, the identification was reliable. The factors to be used in determining reliability include:

"(i) the opportunity of the witness to view the criminal at the time of the crime;

(ii) the witness' degree of attention;

(iii) the accuracy of the witness' prior description of the criminal;

(iv) the level of certainty demonstrated by the witness at the confrontation;

(v) the length of time between the crime and the confrontation."

*Webster, supra,* 299 Md. at 607, 474 A.2d 1305. In deciding whether to suppress evidence of the identification, the court then weighs the reliability of the identification against the "corrupting effect" of the suggestiveness. *Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. at 2253; *see Webster, supra,* 299 Md. at 607, 474 A.2d 1305 (explaining in detail the second stage).

In the context of a pretrial photographic identification, a witness's reliability is not relevant for due process purposes, unless and until the defendant establishes that the identification procedure was in some way suggestive. Jones failed in this endeavor. As already indicated, the trial court carefully reviewed both the testimony and the photograph array itself in concluding that no suggestiveness tainted Mrs. Jordan's identification of the photograph. Consequently, the reliability of the identification simply was not at issue during the suppression hearing.

Nor was the excluded question relevant to Mrs. Jordan's credibility in identifying Jones's photograph at the hospital. Sustaining the State's objection to the inquiry in question was within the sound discretion of the trial judge, and absent an abuse of discretion, as here, we will not disturb the lower court's ruling. *E.g., Poole v. State,* 295 Md. 167, 189–90, 453 A.2d 1218 (1983); *Vitek v. State,* 295 Md. 35, 40, 453 A.2d 514 (1982); *Beasley v. State,* 271 Md. 521, 527, 318 A.2d 501 (1974); *Shupe v. State,* 238 Md. 307, 310–11, 208 A.2d 590 (1965). In so concluding, we note that the

inquiry in question was excluded at the suppression hearing, and not at trial. Jones was not prevented from cross-examining Mrs. Jordan on the subject of drugs and alcohol at trial, when Mrs. Jordan's credibility was relevant.[1] We also note that, at trial, counsel for Jones was allowed to question Mrs. Jordan extensively concerning the details and events of that night.

## II

Jones next contends that portions of the prosecutor's closing argument were "flagrantly" improper in that they directed the jury's attention to his physical characteristics and demeanor. Specifically, the prosecutor stated to the jury:

"I ask you now what size the chip on this small man's shoulder? ... And has there ever come a time today, such as right this very moment, when you might feel some coolness in this room? Well, you should. It's from the ice in this man's veins, as he sits nonchalant and unconcerned, as he must have sat in the early morning hours in that chair across from the victims, telling them—and please excuse my vulgarity one time—telling them that I'm tired of people fucking with me.... Mr. Jones and his friends handcuff Lisa Brown to Charles Jordan, lay them on the floor, Linda Jordan facing them, and with the coolness and calmness that Mr. Jones displays here today and has displayed for the last three days, he walked over to Lisa Brown, an hysterical, crying eighteen-year-old girl, put a pillow to the back of her head and literally blew the back of her head off."

We note at the outset that no objection was made to these comments, nor was the trial court requested to take any remedial action regarding them, as required by Md. Rule

---

1. Mrs. Jordan testified that she used no drugs on the night of the crimes.

885 in order to preserve the matter for appellate review.[2] Nevertheless, counsel is afforded wide latitude in presenting closing summation to the jury. The prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom. *State v. Calhoun,* 306 Md. 692, 717, 511 A.2d 461 (1986); *Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707 (1974). Accordingly, counsel "may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions ... [and is] free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments." *Wilhelm, supra,* 272 Md. at 412–13, 326 A.2d 707. On the other hand, *Wilhelm* also recognizes that it is "fundamental to a fair trial that the prosecutor should make no remarks calculated to unfairly prejudice the jury against the defendant." 272 Md. at 413, 326 A.2d 707 (quoting *Reidy v. State,* 8 Md.App. 169, 172, 259 A.2d 66 (1969)). And it is wrong for a prosecutor to refer to any matter not disclosed by the evidence in the case. *Id.* However, the mere fact that a remark made by the prosecutor to the jury was improper does not necessarily require a conviction to be set aside. Reversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused. *Wilhelm, supra,* 272 Md. at 415, 326 A.2d 707; *Wood v. State,* 192 Md. 643, 652, 65 A.2d 316 (1949). Consistent with this rule, the Supreme Court has held that reversal is only required where the prosecution's remarks were focused, unambiguous and strong, and so prejudiced a specific right that to allow them to go uncorrected would deprive the accused of

---

**2.** In capital cases the Court is less strict about the failure to preserve issues for review and may, under appropriate circumstances, exercise its discretion to address the merits of such issues. *Foster, Evans and Huffington v. State,* 305 Md. 306, 316, 503 A.2d 1326, *cert. denied,* —— U.S. ——, ——, 106 S.Ct. 3310, 3315, 92 L.Ed.2d 722, 745 (1986); *Johnson v. State,* 292 Md. 405, 412 n. 3, 439 A.2d 542 (1982).

fundamental fairness. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). *See also State v. Tichnell*, 306 Md. 428, 509 A.2d 1179 (1986). By way of illustration, in *Caldwell v. Mississippi, supra,* reversal was required where the prosecution told the jury that it need not believe that its decision on whether to impose the death sentence was final because the defendant had an automatic right of appeal.

The prosecutor's comments under the circumstances of the present case do not warrant reversal of the convictions. Certainly, his description of the ruthless cold-blooded manner in which the murders were committed was fairly drawn from the evidence. Indeed, the jury had listened to Mrs. Jordan's testimony as she described how, in her presence, her husband and screaming eighteen-year-old daughter were executed as they lay on the floor of their home, helpless and handcuffed.

Nor do the prosecutor's comments regarding Jones's physical characteristics and demeanor warrant reversal. Indeed, the jury had the opportunity to observe Jones throughout the trial. The jurors, therefore, were free and able to make their own independent evaluation of Jones's appearance. Moreover, the jury was instructed that the only evidence it was to consider was the testimony of witnesses, exhibits introduced into evidence and stipulations of the parties. They were specifically instructed not to consider, as evidence, comments made by the prosecutor during closing argument.

### III

Jones contends that his convictions must be reversed under *Carr v. State*, 284 Md. 455, 397 A.2d 606 (1979) because the State failed to disclose three prior statements of Mrs. Jordan, thus depriving him of the opportunity to cross-examine her concerning alleged inconsistencies between her testimony and her prior statements. Jones further alleges that one of the statements contained exculpato-

ry evidence and that its nondisclosure requires reversal in any event under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Two of the statements were given to law enforcement officers. The first was taken by Officer Kevin Doyle of the Baltimore County Police Department and consists of two typed, single-spaced pages. It contains a description supplied by Mrs. Jordan of events leading up to, during and following the crimes; it was given during the time that Mrs. Jordan received medical assistance for her wounds in the ambulance, at the hospital emergency room, and later in her hospital room. The second statement was taken by Agent Emory L. Waters of the Federal Bureau of Investigation. It consists of four typed, single-spaced pages and was obtained from Mrs. Jordan eleven days after the murders. It also describes the circumstances surrounding the crimes. Both of these statements are comprised of the notes of police investigators or summaries of what Mrs. Jordan told them during interviews. Because neither of them was signed or otherwise adopted by Mrs. Jordan, the State contends that it was under no obligation to produce them.

The third statement also outlines the events surrounding the crimes. Unlike the others, this two-page statement is in Mrs. Jordan's own handwriting and is signed by her. Defense counsel made no request for this statement at the conclusion of Mrs. Jordan's direct examination by the State, even though she made reference to it in her testimony. Rather, defense counsel reserved the right to recall Mrs. Jordan at a later time. The following day of trial defense counsel made note of Mrs. Jordan's testimony concerning her prior statement. During the noon recess, the State located the statement which it had earlier misplaced. The defense was then given the opportunity to recall and cross-examine Mrs. Jordan concerning the statement but counsel declined to do so.

(a)

In *Carr v. State, supra,* we first held that at trial, upon request, defense counsel must be permitted the opportunity

to inspect prior statements of the State's witnesses for purposes of cross-examination. Later in *Leonard v. State*, 46 Md.App. 631, 637–38, 421 A.2d 85 (1980), Judge Wilner, for the court, summarized the principles set forth in *Carr*, stating:

"Carr makes clear beyond question that a defendant's right, at trial, to inspect the prior statement of a State's witness who has testified is not necessarily limited (1) by the rules pertaining to pretrial discovery, or (2) to statements that are merely exculpatory. When confronted with the actual testimony of a critical witness and the knowledge that the witness has given a prior statement bearing on a material issue in the case, counsel is not engaged in a mere 'fishing expedition' in seeking access to the prior statement. At that point, it becomes more than a matter of casting a seine over the State's files to see what turns up, but of directly confronting the witness; and the statement thus assumes a specific importance and relevance beyond its general value for trial preparation."

We affirmed *Leonard* and adopted its rationale at 290 Md. 295, 429 A.2d 538 (1981).

The principles adopted in *Carr* were earlier enunciated by the Supreme Court in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). In *Carr*, we fully concurred in the reasoning underlying the *Jencks* decision, quoting therefrom as follows:

"Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-ex-

amining process of testing the credibility of a witness' trial testimony."

353 U.S. at 667, 77 S.Ct. at 1013.

Subsequently, Congress codified the rules announced in *Jencks* and required for federal practice by the Supreme Court, pursuant to its supervisory power under 18 U.S.C. § 3500 (1985). While *Carr* did not wholly adopt these discovery rules, subsequent interpretation and analysis of them by the Supreme Court in light of *Jencks* is instructive in defining the proper scope of our holding in *Carr*. In this regard, 18 U.S.C. § 3500(e) provides in pertinent part:

"(e) The term 'statement', as used in subsections (b), (c), and (d)[3] of this section in relation to any witness called by the United States, means—

---

3. Subsections (b), (c) and (d) of § 3500 provide:

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury."

In *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), the defendant was convicted of tax evasion. On cross-examination of his accountant, the defendant requested a memorandum prepared by IRS agents summarizing an interview they had conducted with the accountant as part of their investigation. The trial judge denied the request, finding that the agents' summary was not a "statement" within the meaning of 18 U.S.C. § 3500(e)(1). The Supreme Court agreed, noting that the statute permits production of "a written statement made by said witness and signed or otherwise adopted or approved by him...." The Court said:

"One of the most important motive forces behind the enactment of this legislation was the fear that an expansive reading of *Jencks* would compel the undiscriminating production of agent's summaries of interviews regardless of their character or completeness."

360 U.S. at 350, 79 S.Ct. at 1223. The Court further observed:

"It is clear that Congress was concerned that only those statements which could properly be called the witness'

---

(d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

own words should be made available to the defense for purposes of impeachment. It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions."

*Id.* at 352, 79 S.Ct. at 1224.

For purposes of applying the rule of *Carr*, we think that a "statement" under Maryland law is one given by a witness under the circumstances set forth in § 3500(e). In so holding, we are in accord with prior decisions of the Court of Special Appeals which deny the use of police notes and investigatory summations not adopted by witnesses as their own. *Jacocks v. Montgomery County*, 58 Md.App. 95, 472 A.2d 485 (1984); *Whitehead v. State*, 54 Md.App. 428, 458 A.2d 905, *cert. denied*, 296 Md. 655 (1983).

The statements taken by Officer Doyle and Agent Waters were summaries of information given to them by Mrs. Jordan during interviews. They were neither signed nor adopted by Mrs. Jordan. Accordingly, the rule in *Carr* is inapplicable to them. Regarding the handwritten and signed statement of Mrs. Jordan, we note that defense counsel was given an opportunity to cross-examine Mrs. Jordan concerning its contents but declined to do so. His claim that it was too late to recall Mrs. Jordan is unconvincing in the circumstances; indeed, he had previously chosen to postpone further testimony by this witness.

(b)

■ Jones also claims that a statement Mrs. Jordan made to Agent Waters of the F.B.I. contained exculpatory evidence, and the failure of the State to produce it requires reversal under *Brady v. Maryland, supra.* The record discloses that Mrs. Jordan told Agent Waters that her husband once told her that one "Ghost" Kane had a "hit" on him. The mere possibility that there may have been an additional principal to the crime, who might have paid Jones

to kill Jordan, is hardly exculpatory as to Jones. Also, under the facts of this case, the mere existence of another individual who wanted Jordan killed does not raise a reasonable probability that the result of the trial would have been different had such evidence been disclosed. *See United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *State v. Tichnell,* 306 Md. 428, 509 A.2d 1179 (1986). Even if this information were deemed exculpatory as to Jones, the failure of the State to produce it does not require reversal because a report prepared by a federal agency cannot be said to be within the possession or control of the State for purposes of applying *Brady. See Grandison v. State,* 305 Md. 685, 746, 506 A.2d 580 (1986).

## IV

█ During direct examination Mrs. Jordan made an in-court identification of Jones as the murderer. Asked by the prosecutor whether she had "ever seen the defendant before this day," the witness responded: "I had went to visit him with my husband at Lewisburg." Defense counsel objected and moved for a mistrial because the statement that Jones was "at Lewisburg" would be interpreted by the jury to mean that at one time he was an inmate at the Lewisburg Federal Correctional Institution. The mistrial motion was denied, and Jones declined the trial court's offer to give a cautionary instruction to the jury. Jones argues to us that Mrs. Jordan's statement constituted notice to the jury of his prior criminal record and that this information was "devastating" to his defense.

Certainly, evidence of a defendant's prior criminal acts, unrelated to the case at trial, is inadmissible. *Lodowski v. State,* 302 Md. 691, 728, 490 A.2d 1228 (1985), *vacated on other grounds,* 475 U.S. 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986); *Straughn v. State,* 297 Md. 329, 333, 465 A.2d 1166 (1983); *Tichnell v. State,* 287 Md. 695, 711, 415 A.2d 830 (1980). Nevertheless, the declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice.

The naked reference to Lewisburg, in the circumstances of this case, did not require the trial judge to grant a mistrial. Although it may be generally known that a federal prison is located at Lewisburg, Pennsylvania, no mention was made of Jones's prior criminal record or that he had been an inmate at the prison. All things considered, we find insufficient evidence of prejudice to Jones and conclude that the trial court did not abuse its discretion in refusing to order a mistrial.

## V

At trial, Detective Ron Long testified over objection that as a result of an initial interview with Mrs. Jordan "the suspect ... was identified as Gregory Jones." Long further testified that he went to the hospital two days after the crimes and showed Mrs. Jordan a photographic array containing Jones's picture and that she identified Jones as the assailant. Jones contends that the effect of Long's testimony was to introduce a hearsay statement, i.e., Mrs. Jordan's earlier statement that Jones was involved in the offenses. Jones also argues that the admission of this testimony was prejudicial in that an important aspect of his defense was Mrs. Jordan's failure to identify Jones immediately following the offenses.

Putting aside the question whether Long's testimony constituted an out-of-court declaration of Mrs. Jordan, the detective's testimony was not inadmissible as hearsay evidence because it was not offered as an assertion of truth. *Grandison v. State, supra,* 305 Md. at 737, 506 A.2d 580; *Lunsford v. Bd. of Education of Prince Georges County,* 280 Md. 665, 670, 374 A.2d 1162 (1977). Rather, Long's testimony concerning his initial interview with Mrs. Jordan was offered to explain how it came to be that police concluded Jones was a suspect and included his picture among those in the photo array later shown to Mrs. Jordan. Furthermore, we note that Long's testimony did not prejudice Jones because Mrs. Jordan had testified earlier, without objection, that she named Jones as the perpetrator of the

shooting in her initial interview with Long. Where competent evidence of a matter is received, no prejudice is sustained where other objected to evidence of the same matter is also received. *Robeson v. State,* 285 Md. 498, 507, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980); *Peisner v. State,* 236 Md. 137, 145, 202 A.2d 585 (1964), *cert. denied,* 379 U.S. 1001, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965).

## VI

 The trial court instructed the jury that "the identification of the defendant by a single eyewitness is sufficient evidence upon which to convict the defendant." Defense counsel excepted to this instruction, claiming that it should have been qualified by use of the words "if believed" and that the omission of that qualifying term conveyed the impression that "the simple fact of an eyewitness identification is enough to sustain a conviction."

The propriety of a specific jury instruction may not be considered in isolation, apart from its overall context. On the contrary, it should be considered within the context of all the instructions given the jury. *State v. Garland,* 278 Md. 212, 220, 362 A.2d 638 (1976); *Powell v. State,* 56 Md.App. 351, 372, 467 A.2d 1052 (1983), *cert. denied,* 299 Md. 137, 472 A.2d 999 (1984). In the present case, prior to instructing the jury as to the legal sufficiency of a single eyewitness identification, the trial court stressed that the jury was not required to accept as evidence testimony which it did not believe, and that it should afford evidence only the weight it considered appropriate. The court told the jurors:

"It is your duty to accept and act upon that part of the evidence which you believe to be true and to reject that which you believe to be untrue. You have the sole discretion in deciding the truth of the testimony and the weight to be given to the testimony of each witness, as well as the sole discretion to decide what inferences may be drawn from that testimony. You may consider the reasonableness or unreasonableness and the probability

or improbability of the testimony of a witness in determining whether to accept it as true and accurate.

In reaching a conclusion as to the credibility of any witness and in weighing the testimony of any witness, you may consider any matter that may have a bearing upon the subject. You may consider the demeanor and the behavior of the witness on the witness stand; the witness's manner of testifying; whether the witness impresses you as a truthful individual; whether the witness impresses you as having an accurate memory and recollection; whether the witness had full opportunity to observe the matters concerning which he or she has testified; whether the witness has any interest in the outcome of this case or friendship or animosity towards other persons concerned in this case."

Given the clarity of these instructions, we think the jury was adequately informed that a single eyewitness identification was sufficient to convict only "if believed" by them.

Jones contends that the single eyewitness instruction was inappropriate because it "placed too much weight upon the testimony of a single witness." He argues that the rule as to the legal sufficiency of the identification of a single witness is a principle of appellate review which is inappropriate as a jury instruction because "it is clearly improper to instruct the jury that a particular source of evidence is entitled to more weight than any other source." However, shortly before giving the single eyewitness instruction in this case, the trial judge cautioned the jury that "[i]n determining whether to accept the testimony of a witness as true and accurate, you may consider whether he or she has been contradicted or corroborated by other credible evidence." Given this instruction, and the court's prior declaration that the truthfulness and weight given a witness' testimony was a question for the jury's determination, we find no merit here in the argument that the single eyewitness instruction placed too much weight on Mrs. Jordan's testimony. *See England and Edwards v. State,*

274 Md. 264, 275–76, 334 A.2d 98 (1975); *Powell v. State, supra.*

## VII

We next consider whether the trial court committed prejudicial error in rejecting Jones's pretrial motion to waive his right to be sentenced by a jury.

At a bench conference immediately preceding voir dire, counsel for Jones requested the court to refrain from informing the prospective jurors that the case might result in a death penalty. Specifically, he asked the court to deny the State's request for voir dire questions concerning the jurors' attitudes, either for or against, the death penalty. In return, Jones agreed to waive his right to be sentenced by a jury if he was convicted of first degree murder.

The court denied Jones's request. In explaining that waiver of the right to be sentenced by a jury would be "premature" at that stage, the court said: "There are many, many things that will occur during the course of the trial that will affect the ultimate decision that the defendant, himself, must make as to whether he wants the sentencing to be done by the Court or by the jury." If convicted of first degree murder, the court continued, Jones might change his mind and seek to withdraw the waiver. If granted, a new jury would have to be impaneled for sentencing, since the first jury would not have been death-qualified. The court concluded that this would contravene Article 27, § 413(a) and (b). It stated:

"To require at that point the dismissal of the jury and the selection of a new jury, the Court feels is not a valid situation to create at the beginning of a trial. The Court, of course, can dismiss the jury for compelling reasons and have a new jury selection, but there has to be a basis for it, and to create that basis at the beginning of trial by not putting voir dire questions which are appropriate questions, and to be accompanied by careful instruction of the Court, would be creating a situation that is unfair to all the parties, that is a waste of judicial time and a tremen-

dous expense to everyone concerned, and the ultimate result is that the spirit of the statute would be violated in that the defendant has an option to be sentenced by the jury that tried the case or by the Court, and not by a second jury that has not participated in the trial."

During the court's voir dire of the jurors, it inquired whether any of them had strong feelings for or against capital punishment, and whether those feelings would hamper them in the performance of their duties. On the basis of their responses, several jurors were excused for cause. Following convictions on the two counts of first degree murder, Jones exercised his right to be sentenced by the jury.

The precise issue before us is whether a trial court must accept a waiver of the right to be sentenced by a jury in a capital case, when the waiver is tendered prior to trial and for the sole purpose of preventing the death qualification of jurors during voir dire.

Among other jurisdictions, only Illinois has addressed this issue. The relevant portion of the Illinois death penalty sentencing statute provides:

"(d) Separate sentencing hearing. Where requested by the State, the court shall conduct a separate sentencing proceeding to determine the existence of factors set forth in subsection (b) and to consider any aggravating or mitigating factors as indicated in subsection (c). The proceeding shall be conducted:

1. before the jury that determined the defendant's guilt; or

2. before a jury impanelled for the purpose of the proceeding if:

A. the defendant was convicted upon a plea of guilty; or

B. the defendant was convicted after a trial before the court sitting without a jury; or

C. the court for good cause shown discharges the jury that determined the defendant's guilt; or

3. before the court alone if the defendant waives a jury for the separate proceeding."

Ill.Rev.Stat. (1983) ch. 38, par. 9–1(d).

In *People v. Wolfbrandt*, 127 Ill.App.3d 836, 82 Ill.Dec. 771, 469 N.E.2d 305 (1984), the defendant sought to prevent death qualification of the jury by waiving, before trial, his right to be sentenced by a jury. The Appellate Court of Illinois held that the statute, by its language, rendered the waiver untimely. *Id.* 82 Ill.Dec. at 777–78, 469 N.E.2d at 311–12 ("the entire section speaks only in post-conviction terms"). Less than two years later, however, the Supreme Court of Illinois disavowed that portion of *Wolfbrandt*. *Daley v. Hett*, 113 Ill.2d 75, 99 Ill.Dec. 132, 135, 495 N.E.2d 513, 516 (1986). The court there stated that the provision pertaining to waiver is "clear and unambiguous." It added:

"It neither limits the right nor designates at what stage of the proceedings the defendant may exercise such right. Under its express language, therefore, we find that a defendant charged in a capital punishment case is accorded the right to waive [before trial] the jury for the separate sentencing proceeding."

*Id.* 99 Ill.Dec. at 135, 495 N.E.2d at 516. The court concluded that the waivers before it were voluntary and knowing and thus could properly be accepted.

The analogous provision in the Maryland statute is virtually identical to that construed in *Daley* and *Wolfbrandt*. We are not, however, constrained to follow the law of Illinois. We think that in order to properly resolve this issue, we must examine and balance two aspects of death penalty cases: death qualification of jurors and waiver of the right to be sentenced by a jury.

Death qualification consists of questioning prospective jurors about their attitudes towards capital punishment. If a juror opposes the death penalty so strongly that it will prevent or substantially impair the performance of the juror's duties, the juror may be struck for cause. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137

(1986); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *State v. Calhoun,* 306 Md. 692, 511 A.2d 461 (1986); *Foster v. State,* 304 Md. 439, 499 A.2d 1236 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986); *Evans v. State,* 304 Md. 487, 499 A.2d 1261 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986). The purpose, of course, is to obtain an impartial jury—one which will "conscientiously apply the law and find the facts." *Lockhart v. McCree, supra,* 106 S.Ct. at 1767; *Wainwright v. Witt, supra,* 469 U.S. at 423, 105 S.Ct. at 852.

Both the Supreme Court and this Court have recently rejected arguments that death qualifying a jury prior to the guilt phase of a bifurcated capital case yields an unconstitutionally "conviction-prone" jury. In *Lockhart v. McCree,* which originated in Arkansas, the defense relied upon several social science studies in an attempt to establish that jurors who do not oppose the death penalty tend to favor the prosecution, especially during the guilt-innocence phase. 106 S.Ct. at 1762. The Court rejected the studies, identifying a number of methodological flaws. In order to reach the constitutional issues, however, the Court assumed that the studies had some reliability. *Id.* at 1764. Even in that context, the Court held that death qualification during pretrial voir dire does not violate the constitutional right to a jury drawn from a representative cross-section of the community and to an impartial jury. *Id.* at 1766, 1770.

*McCree* stressed that impartiality means nothing more than an ability to conscientiously apply the law to the facts. A juror having personal qualms about capital punishment may not be excluded on that basis alone: the misgivings must be of at least such magnitude as to substantially impair the juror in performing his or her duties. On the other hand, the Court recognized that the State has a strong, "entirely proper" interest in having a single jury decide both phases of a capital murder trial. *Id.* at 1768 (citing *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49

L.Ed.2d 859 (1976)). The court noted, *id.* at 1768–69, that the Arkansas Supreme Court has specified two interests served by that State's requirement of a unitary jury. First, in a capital case, the questions of guilt and punishment are "necessarily interwoven." *Rector v. State,* 280 Ark. 385, 659 S.W.2d 168, 173 (1983), *cert. denied,* 466 U.S. 988, 104 S.Ct. 2370, 80 L.Ed.2d 842 (1984). Second, much of the evidence will have a bearing on both phases of the trial. That evidence will have to be presented twice if two juries are involved, yet "[s]uch repetitive trials could not be consistently fair to the State and perhaps not even to the accused." 659 S.W.2d at 173.

The Court in *McCree* pointed out one further interest: "the possibility that, in at least some capital cases, the defendant might benefit at the sentencing phase of the trial from the jury's "residual doubts" about the evidence presented at the guilt phase." *McCree,* 106 S.Ct. at 1769 (citing *Grigsby v. Mabry,* 758 F.2d 226, 247–48 (8th Cir. 1985) (Gibson, J., dissenting), *rev'd sub nom. Lockhart v. McCree, supra,* 106 S.Ct. at 1758).

*McCree* thus concluded that the pretrial death qualification of jurors creates no cognizable constitutional prejudice, and advances the State's legitimate interest in the unitary jury system.

We have also rejected the argument that pretrial death qualification results in unconstitutionally prosecution-prone juries. *State v. Calhoun, supra,* 306 Md. at 716, 511 A.2d 461 (and cases cited therein); *State v. Tichnell,* 306 Md. 428, 458, 509 A.2d 1179, *cert. denied,* —— U.S. ——, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986); *Foster v. State, supra,* 304 Md. at 453, 499 A.2d 1236. Consequently, any strategical advantage a defendant might obtain by preventing the death qualification of a jury is speculative at best.

Maryland's death penalty sentencing procedure, as prescribed in Art. 27, § 413(a-b), provides:

(a) *Separate sentencing proceeding required.*—If a person is found guilty of murder in the first degree, and

if the State had given the notice required under § 412(b), a separate sentencing proceeding shall be conducted as soon as practicable after the trial has been completed to determine whether he shall be sentenced to death or imprisonment for life.

(b) *Before whom proceeding conducted.*—This proceeding shall be conducted:

(1) Before the jury that determined the defendant's guilt; or

(2) Before a jury impaneled for the purpose of the proceeding if:

(i) The defendant was convicted upon a plea of guilty;

(ii) The defendant was convicted after a trial before the court sitting without a jury;

(iii) The jury that determined the defendant's guilt has been discharged by the court for good cause; or

(iv) Review of the original sentence of death by a court of competent jurisdiction has resulted in a remand for resentencing; or

(3) Before the court alone, if a jury sentencing proceeding is waived by the defendant.

Subsection (a) requires a separate sentencing proceeding; subsection (b) addresses before whom the hearing shall be conducted. A defendant may choose to be sentenced by either the judge or a jury. At the same time, the statute unambiguously provides that where a defendant elects to have a jury decide the entire case, the same jury, as a general rule, shall hear both phases. *Id.* § 413(b)(1–2). The General Assembly has thereby manifested the State's interest in having one jury decide all issues. As we have noted, this interest (along with other considerations) justifies death qualifying juries before the guilt or innocence phase.

Subsection (b)(3) of § 413 permits a defendant to waive sentencing by a jury. It is silent, however, as to the appropriate time for the tendering and acceptance of the

waiver. Jones maintains that nothing in the language precludes a pretrial waiver, and that in criminal practice, "[e]arly waivers in exchange for present benefits are common...." The State counters with an observation that at the beginning of trial, the right to be sentenced by a jury is not absolute. Rather, it is contingent upon a finding of guilt as to first degree murder. The determinative consideration is whether the trial judge must accept a waiver of jury sentencing so far in advance, without regard to the impact of subsequently ensuing events upon the validity and enforceability of the waiver.

The United States Constitution does not confer a right to jury sentencing in a capital case. *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). That right and the concomitant right to waive the jury are created by statute. Art. 27, § 413. Even though a constitutional right is not involved, however, we indicated in *Harris v. State*, 295 Md. 329, 339, n. 1, 455 A.2d 979 (1983), that to be effective, a waiver must be made knowingly and voluntarily. *See also Tichnell v. State*, 287 Md. 695, 743–44, 415 A.2d 830 (1980).

Whether a defendant can "knowingly" waive his right to be sentenced by a jury prior to commencement of the guilt or innocence phase of the trial is fraught with uncertainty. At that stage, the defendant understandably might hope for acquittal or for conviction on lesser charges. Similarly, in a case involving multiple victims, the defendant might only be convicted on some, rather than all, of the first degree murder counts. Finally, as the trial judge below observed, the defendant cannot possibly know what will come out during trial. Among other things, the defendant is in no position to assess how damaging the State's evidence or how credible each side's witnesses will be. In short, the defendant's choice of sentencing authority is bound to be influenced by the course of the trial itself. It follows that the defendant will make a far more knowing waiver after the trial than before it.

Even assuming that a pretrial waiver of the right to be sentenced by a jury can meet the knowing and voluntary standard, efforts to withdraw such waivers prior to the sentencing phase will doubtless occur, creating an additional problem: the statutory preference for a single jury will hamper the court's exercise of discretion in deciding whether to permit withdrawal.

In Maryland, a defendant has no absolute right to withdraw his waiver of a jury trial. *State v. Jones*, 270 Md. 388, 312 A.2d 281 (1973); *see also Mathias v. State*, 284 Md. 22, 394 A.2d 292 (1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979); Maryland Rule 4-246. The disposition of a motion to withdraw lies within the sound discretion of the trial court. However, "[i]t seems generally accepted that withdrawal of a waiver of the right to be tried by a jury should be permitted where it is shown that no unreasonable trial delay would result and that the course of justice would not be impeded." *Jones, supra,* 270 Md. at 393–94, 312 A.2d 281. The judge thus does not have unbridled discretion, but must exercise that discretion soundly, giving due regard to the rights of the defendant upon a showing of good cause.

In both *Jones* and *Mathias,* we upheld denials of motions to withdraw waivers. However, in each instance, the motions came on the day of trial. Moreover, other circumstances existed from which it could be concluded that granting the motions would impede the course of justice. In the case of someone who has just been found guilty of first degree murder, by contrast, the motion to withdraw can be made days, if not weeks, in advance of sentencing. In addition, the inclination to grant such motions, considering all that the defendant has at stake, will in all likelihood be strong. Nonetheless, § 413 only permits a second jury to be impaneled where there is "good cause."

Balancing the interests involved, we conclude that defendants need not be permitted to waive, prior to trial, the right to choose between sentencing authorities, where the sole motive for the waiver is to prevent death qualification of

the jury. Indeed, as earlier observed, the validity of the waiver may be influenced by post-waiver developments at trial. Death qualification of the impaneled jury would ensue, belatedly, and result in the dismissal of at least some of the jurors. Consequently, the jury hearing the sentencing phase would not be the same as that which found the defendant guilty. The general requirement of § 413(b)— that one jury decide all issues—would thereby be controverted. It is axiomatic that we cannot countenance a practice which will all but inevitably contravene the clear legislative intent. This is particularly so where the benefit the defendant will derive from preventing death qualification of the jury is marginal and speculative. We, therefore, conclude that the trial court did not err in declining to accept Jones's pretrial waiver.

## VIII

Jones next contends that the trial court erred in instructing the jury as to the proper capital sentencing procedure under Art. 27, § 413. Specifically, he alleges error in the following instruction:

"If you find that no mitigating factors have been proven by a preponderance of the evidence, and all of the mitigating factors are marked 'No' on the verdict form, and you have previously found that an aggravating factor exists beyond a reasonable doubt, then the sentence must be death."

The sentencing procedure in death penalty cases, contained in Art. 27, § 413, requires in subsection (d) that the jury assess whether any of ten enumerated statutory aggravating circumstances have been proven beyond a reasonable doubt. If no such aggravating factors are found, then the jury is required under § 413(f) to impose a sentence of life imprisonment. Only upon a finding that there are aggravating factors must the jury consider mitigating factors under § 413(g); this provision lists seven statutorily prescribed factors and, additionally, explicitly permits the jury to include any other factors deemed mitigating about

the defendant or the crime. If any mitigating factors are found, § 413(h) then requires the jury to weigh the aggravating factors against the mitigating. If the aggravating outweigh the mitigating, then the statutorily prescribed sentence is death; conversely, if the aggravating do not outweigh the mitigating, then life imprisonment is mandated. Finally, if the jurors cannot reach a unanimous decision within a reasonable time, § 413(k)(2) directs that life imprisonment is the proper sentence.

Maryland Rule 4–343 (formerly 772A) provides that a "Findings and Sentencing Determination" form, or "Verdict Sheet," be given to the jury to complete; it sequentially outlines, as herein set forth, the steps which the jury must follow in returning its verdict. The Verdict Sheet directs the jury to mark "Yes" or "No" after each statutory aggravating and mitigating circumstance, and to add whatever other factors it may deem mitigating. Thereafter, the jury proceeds to the weighing process, if necessary, to determine the proper sentence.

Using the Verdict Sheet, the jury in this case determined that two aggravating factors were present, namely, that Jones committed more than one offense of murder in the first degree arising out of the same incident; and that he committed the murders while committing or attempting to commit robbery. The jury did not mark "Yes" to any of the statutory mitigating circumstances, nor did it indicate any other factors which it deemed mitigating. Accordingly, pursuant to the directions on the Verdict Sheet—no weighing of mitigating and aggravating factors being necessary—the jurors unanimously sentenced Jones to death.

Jones argues that under the statutory sentencing scheme and the court's instructions, the death sentence imposed upon him was unconstitutionally mandatory. In this regard, he says that the death sentence was based on an "arithmetic configuration of aggravating and mitigating factors, without any determination that the death penalty is appropriate under all of the facts and circumstances."

Prior to giving the challenged instructions, the trial judge told the sentencing jury:

"[A]lthough this is a [Verdict Sheet] with answers to be checked 'Yes' or 'No', you are engaged in more than a mere counting of aggravating and mitigating circumstances, or going through a checklist. It is going to be your duty to weigh each of the factors, the aggravating and mitigating, to determine either a sentence of life or a sentence of death."

Thus, the jury was admonished against mechanically tabulating the aggravating versus the mitigating factors; any confusion that may possibly have arisen was thereby cured.[4]

Jones' other argument—that the absence of mitigating factors should not preclude the jury from considering whether the death penalty was appropriate in his case—is similarly unpersuasive. We disposed of the same contention in *Foster v. State*, 304 Md. 439, 499 A.2d 1236 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). There, we held that the capital sentencing statute was not unconstitutionally mandatory in view of the provisions of § 413(g)(8) which allow for individual determinations of mitigating circumstances. We said:

"A sentencing authority, unconvinced that death is appropriate, may list as a mitigating circumstance whatever factor or factors may have led to this conclusion, irrespective of what the defendant produced or argued. If the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it outweighs the aggravating circumstances. Therefore, as we have repeatedly stated, the Maryland statute is not a mandatory death penalty law." 304 Md. at 474–75, 499 A.2d 1236.

---

**4.** Jones did not take exception to any of the trial court's instructions; consequently, Jones' contention is not preserved for appellate review as a matter of right. *See Foster, Evans and Huffington v. State,* 305 Md. 306, 318, 503 A.2d 1326 (1986).

Jones attempts to distinguish *Foster* on the basis that it did not encompass cases where individual members of the jury may discern different mitigating circumstances, but are unable to agree as a whole as to a single mitigating factor. Jones suggests that if mitigating factors can only be found if all twelve jurors agree, he will be denied the benefit of differing opinions among jurors as to the existence of mitigating circumstances. Thus, the argument goes, even if the jury members believe that death is inappropriate, under the operation of the statute and the instructions given, they would be required to impose such a sanction even though as individuals they separately perceived the existence of different mitigating factors.

Specifically, Jones draws attention to § II of the Verdict Sheet which provides:

"Based upon the evidence, we unanimously find that each of the following mitigating circumstances that is marked 'yes' has been proven to exist by A PREPONDERANCE OF THE EVIDENCE. Each mitigating circumstance that has not been so proved is marked 'no.'"

Jones alleges that the jurors would have to mark "No" to a mitigating factor if all could not agree. Thus, he asserts that "[b]ecause of the mechanical operation of the statute, any dissenting juror who was convinced of the existence of one or more of these factors was absolutely precluded from giving it any weight at all on the ultimate decision of life and death." Jones says that even if the statute is not unconstitutionally mandatory, the directions of the Verdict Sheet, in effect, mandate a death sentence, even though a different result may have been reached had the jury been given an opportunity to express their individual preferences.

We find this argument unpersuasive in light of *Mills v. State*, 310 Md. 33, 527 A.2d 3 (1987). There, as here, it was contended that due to the mechanical operation of the statute jurors may be required to return a death sentence even when they individually felt it to be inappropriate in

that particular case. There, as here, it was contended that unless all twelve jurors agreed on the existence of the same mitigating factor or factors, they would be required to impose a sentence of death if any aggravating factors had been found. By way of illustration, it was suggested in *Mills* that six jurors may find one mitigating circumstance to exist, but another six may perceive another set of mitigating circumstances; and since they could not unanimously mark "Yes" to any one, they would be required to find that none existed, thereby automatically invoking the death penalty if any aggravating circumstances had previously been found.

This argument, we said in *Mills*, was founded on an erroneous construction of the statute. We first recognized that unanimity is generally required for all jury determinations, 310 Md. at 52–53, including sentencing in death penalty cases.[5] We reasoned that if the jury could not reach a unanimous decision as to a mitigating factor, this did not necessarily mean that no mitigating circumstances must be indicated, causing the death penalty to be imposed. Instead, we focused on the fact that if one juror maintained that there was some mitigation which was not outweighed by an aggravating factor, then the decision could not be unanimous as to the nonexistence of mitigating circumstances, and therefore the death penalty could not be returned. Moreover, we noted that under § 413(k)(2), if the jury could not agree within a reasonable time, the ultimate outcome in such a situation would be life imprisonment, not death.[6]

The verdict form used in *Mills* and in the present case both require unanimity. Although the wording of the

---

**5.** *See* § 413(i) which provides:
 "(i) *Determination to be written and unanimous.*—The determination of the court or jury shall be in writing, and, if a jury, shall be unanimous and shall be signed by the foreman."

**6.** The Court reasoned in *Mills* that in order to effectuate legislative intent, if there is jury disagreement as to the existence of a mitigating factor, but if they also could not agree that none existed, then they

eighth factor corresponding to § 413(g)(8) is slightly different on the two forms, the substance remains the same. Additionally, two lines were allocated on the *Mills* form to write in any other mitigating circumstance, while the form used by the Jones jury afforded six lines for the same purpose.

The only other deviation between the two forms is found in the section entitled "Determination of Sentence." In *Mills*, the directions instructed the jury to enter a life sentence if either: (1) no aggravating factors had been found, or (2) if any aggravating factors found to exist did not outweigh any mitigating factors similarly perceived. With one minor difference, attributable to an obvious typographical error,[7] the Jones form instructed the jury to impose a life sentence if either: (1) no aggravating factors were proven, or (2) if any mitigating factors were found. Since the Jones jury found no mitigating factors to exist on Jones' behalf, the error on the form was harmless, there being no need to engage in the weighing process. Consequently, neither the Jones nor *Mills* form afforded the jury any more discretion than the other. Thus, the rationale of *Mills* is clearly controlling in this case.

## IX

Jones further contends that the trial judge's failure to instruct the jury that the sentence of death must be justified under all the facts and circumstances constituted plain error. The same contention, based on the same instruction, was made and found to be an incorrect statement of the governing law in *Scott v. State*, 310 Md. 277, 529 A.2d 340 (1987). *See also State v. Tichnell*, 306 Md. 428, 467–68, 509 A.2d 1179, *cert. denied*, —— U.S. ——, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986) (similar instruction properly denied).

---

should proceed to the weighing process under § 413(h). 310 Md. at 67–68, 527 A.2d 3.

**7.** A reference was made to Section II instead of Section III as provided for under Md. Rule 4–343.

Furthermore, Jones' contention that he was not accorded an individualized determination is plainly belied by the following instruction of the trial judge:

"To conclude, you are to consider the following type of evidence in making your determination of the sentence ... any other evidence of probative value and relevant to sentencing, including any evidence you have learned in Court about the defendant and the crime.

"You may consider evidence relating to the defendant's background, as well as relevant and material conduct of the defendant up to and including this sentencing proceeding."

## X

Jones next submits that under § 413(g)(6), he was entitled to a jury finding on the mitigating circumstance that his acts were not the sole proximate cause of the victims' deaths. Specifically, he points to the fact that his two accomplices first gained entry into the victims' house and then handcuffed and forced them to the floor. Jones argues, therefore, that even if he had shot and killed the victims, his act was not the sole cause of their deaths.

This argument was rejected in another capital case, *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985), *cert. denied,* — U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986). There, we concluded that it was the legislative intention not to include accomplices aiding the principal actor, within the meaning of proximate cause under § 413(g)(6). 304 Md. at 534. *Accord Huffington v. State*, 304 Md. 559, 574–75, 500 A.2d 272, 279–80 (1985), *cert. denied,* — U.S. ——, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986). *See also Booth v. State*, 306 Md. 172, 219–20, 507 A.2d 1098 (1986) (conviction of principal in second degree does not preclude a finding that defendant was "sole proximate cause" of death).

## XI

Jones also contends that he did not knowingly and intelligently elect to have a jury sentence him. He claims

that he was misled by a statement made by the trial judge while explaining the sentencing procedure to him, namely, that Jones' past criminal record and certain other damaging evidence would be considered by a judge, but not by a jury, during sentencing. This statement, he asserts, precluded a knowing and intelligent selection on his part.

The record discloses that Jones decided on a jury sentencing procedure even before he had been advised of his sentencing rights by the trial judge. Jones' attorney had previously discussed the matter with him and had explained the different aspects of electing either the court or the jury as the sentencing authority. In addition, the trial judge thoroughly explained the sentencing procedure to Jones. First, he discussed the ramifications of selecting a jury to sentence him; then he explained how a judge would function as the sentencing authority, if so selected. Jones' claim that he was misled in making his election is based on the following statement made to him by the trial judge:

"The Court would consider any evidence of any criminal convictions, pleas of guilty or nolo contendere, or the absence of such to the same extent admissible in other procedures. The jury in the case would consider any presentence investigation report; however, any recommendation as to sentence that is contained in that report would not be admissible. The jury would not consider it, nor the Court, if it were heard by the Court. And any other evidence that the Court deems of a probative value and relevant to the sentence, with an opportunity for you to rebut such other evidence."

Taken in proper context, as the Attorney General so cogently notes, the court's statement to Jones first fully explained all aspects of sentencing before a jury, including the types of evidence it would consider in determining the existence of aggravating and mitigating circumstances and the State's burden of proof. The court further advised Jones with respect to other evidence, including prior convictions, that the jury could consider in sentencing if the court deemed such evidence admissible and probative. It was at

this point that the court made its statement, as previously set forth, that it would consider any evidence of criminal convictions to the same extent admissible in other procedures, and that the jury would consider any other evidence that the court deemed of probative value and relevant to sentencing. Thus, the trial judge did not imply that Jones' past offenses would only be considered if he elected to be sentenced by the court. Rather, the court said that it would make an initial determination regarding admissibility of such evidence before allowing it to be considered by the sentencing jury.

Jones relies upon *Harris v. State*, 295 Md. 329, 455 A.2d 979 (1983) to support his argument that he did not knowingly and intelligently elect a jury sentencing proceeding. That case involved the omission by the trial judge of a vital fact having an important bearing on the defendant's selection of a jury as the sentencing authority. As no such omission is here involved, *Harris* is simply inapposite.

## XII

Jones next argues that Maryland's death penalty statute is unconstitutional because it places the ultimate burden of persuasion and production on the accused. Specifically, he alleges that under the language and history of § 413(h) the capital defendant bore the burden of proving that the mitigating circumstances outweighed the aggravating circumstances. Furthermore, he asserts that it was not until *Foster v. State*, 304 Md. 439, 499 A.2d 1236 (1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986) that the burden was placed on the prosecutor where it properly belongs. Thus, he contends, as *Foster* was not decided until after his sentence was imposed, the court's reconstruction of the statute did not cure the constitutional error, or, alternatively that he is entitled to the benefit of this "new interpretation." He also argues that the interpretation in *Foster* rendered the statute unconstitutionally vague; that it violated the Ex Post Facto Clause of the Federal Constitution; and, finally, that switching the burden of proof after he was sentenced created the possibility

that the life of an identically situated defendant might be spared, thus violating the eighth and fourteenth amendments.

These exact arguments were made and rejected in *Foster, Evans* and *Huffington,* 305 Md. 306, 503 A.2d 1326, *cert. denied,* —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 723 (*Foster* and *Evans* ), —— U.S. ——, 106 S.Ct. 3315, 92 L.Ed.2d 745 (*Huffington* ) (1986). In answering these same claims, we stated:

> "It is unnecessary to explore in detail or treat separately these constitutional arguments, for they all rest upon the same faulty premise. They are all based upon the defendants' assertions that this Court's opinions prior to *Foster* had construed § 413(h) to place the burden of persuasion on the accused with regard to weighing aggravating and mitigating circumstances and that the opinions in the instant cases changed such construction of the statute. These assertions are flatly erroneous." 305 Md. at 311, 503 A.2d 1326.

Thus, *Foster* is plainly dispositive and Jones' arguments are similarly unavailing.

## XIII

■■■ Jones contends that because he was not charged with robbing either murder victim, the aggravating factor of murder during the commission of a robbery was not established. *See* § 413(d)(10). We disagree.

In construing § 413(d)(10), we seek to effectuate the legislative intention; in doing so, we look to the plain meaning of the statutory language. *In re: Ramont K.,* 305 Md. 482, 484–85, 505 A.2d 507 (1986). To constitute an aggravating factor under § 413(d)(10), the accused must have committed the murder "while committing or attempting to commit a robbery." The statute does not require that the murder victim personally be robbed; rather, its plain language requires only that the murder have occurred during the time that a robbery or attempted robbery was committed.

The record discloses that Jones demanded money and drugs upon entering the Jordan home; that he robbed Mrs. Jordan of her jewelry and that the upstairs had been ransacked. It was during the time of this criminal episode that the two victims were murdered. We think the evidence plainly supports the existence of the aggravating factor, as charged by the State, that the murders were committed by Jones "while committing or attempting to commit a robbery."

## XIV

Finally, as required by Art. 27, § 414(e)(4), we consider whether the death sentence imposed upon Jones "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

*Thomas v. State,* 301 Md. 294, 483 A.2d 6 (1984) involved, as here, the virtually simultaneous murders of two victims within their own home. In undertaking the required proportionality review in that case, we examined a number of "similar cases" and concluded that the death sentence was neither excessive nor disproportionate. Using the same inventory of cases as set forth in *Thomas,* 301 Md. at 334–40, 483 A.2d 6, we find that the death sentence imposed upon Jones was not excessive or disproportionate.

JUDGMENT AFFIRMED WITH COSTS.

McAULIFFE, Judge, concurring and dissenting.

For the reasons given in my dissenting opinions in *Mills v. State,* 310 Md. 33, 74, 527 A.2d 3 (1987), and *Evans v. State,* 304 Md. 487, 539, 499 A.2d 1261 (1985), I respectfully dissent from Sections VIII and XII of the Court's opinion and the decision to affirm the sentence of death. I join in the remainder of the opinion and the decision to affirm the convictions.