684 A.2d 478

**Mary C. TUER, Individually, etc.,**

v.

**Garth R. McDONALD, et al.**

**No. 1993, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Nov. 6, 1996.

122

Robert L. Hanley, Jr. (Stephen J. Nolan and Nolan, Plumhoff & Williams, Chtd., on the brief), Towson, for appellant.

David A. Levin (Jack L. Harvey, Mary C. Rice and Wharton, Levin, Ehrmantraut, Klein & Nash, P.A., on the brief), Annapolis, for appellees.

Argued before FISCHER and HARRELL, JJ., and THEODORE G. BLOOM, Judge (retired), Specially Assigned.

FISCHER, Judge.

Mary C. Tuer, both individually and as the personal representative of the estate of her husband, Eugene E. Tuer, appeals from an order by the Circuit Court for Baltimore County that entered judgment for Garth R. McDonald, M.D., Robert K. Brawley, M.D., and Brawley, McDonald & Lincoln, M.D., P.A. (appellees). Mrs. Tuer filed a four count complaint against appellees in the circuit court following the death of her husband. After the jury found for appellees, the circuit court denied Mrs. Tuer's motion for a new trial, without a hearing.

Mrs. Tuer presents three questions for our review, which we have reworded as follows:

I. Did the circuit court err by excluding evidence that appellees, subsequent to Mr. Tuer's death, changed their procedure for administering the drug Heparin to patients awaiting cardiac surgery?

II. Did the circuit court err by excluding for the purposes of impeaching Dr. McDonald the medical records of another cardiac patient seen at St. Joseph Hospital?

III. Did the circuit court err by refusing to allow Mrs. Tuer to introduce a rebuttal witness?

## FACTS

In September 1992, Mr. Tuer's angina, which was first diagnosed in 1976, became unstable. After conducting a stress test, Mr. Tuer's cardiologist, Dr. Louis Grenzer, recommended that Mr. Tuer have cardiac surgery. Dr. Grenzer referred Mr. Tuer to appellees, who scheduled the surgery for November 9, 1992.

On October 30, 1992, Mr. Tuer began to experience chest pain and, after calling Dr. Grenzer, was admitted to St. Joseph Hospital. While in St. Joseph Hospital, Mr. Tuer continued to have chest pain, so Dr. Grenzer prescribed Heparin, an anticoagulant intended to prevent Mr. Tuer from having a heart attack. Mr. Tuer's surgery was then rescheduled for November 2, 1992. Appellees resumed responsibility for Mr. Tuer on November 1, 1992 and continued his Heparin dosage.

Appellees' and St. Joseph Hospital's standard practice at this time was to discontinue Heparin three to four hours prior to the surgery. One of the major risks associated with bypass heart surgery is inadvertent carotid artery punctures. Discontinuing the Heparin returns the blood's level of coagulation to normal standards, thereby reducing the risk of excessive bleeding associated with carotid artery punctures.

Mr. Tuer's surgery was scheduled specifically for 9:00 a.m. on November 2, 1992. Dr. McDonald discontinued Mr. Tuer's Heparin at 5:30 a.m. that same day. Just prior to the start of Mr. Tuer's surgery, an emergency concerning another patient forced Dr. McDonald to postpone Mr. Tuer's surgery for three to four hours. Dr. McDonald chose not to restart the Heparin, even though he knew that its protective effects would wear off between 7:30 a.m. and 9:30 a.m.

At 1:02 p.m., Dr. McDonald was called to the post-surgical intensive surgery unit. When Dr. McDonald arrived, Mr. Tuer was in cardiac arrest. Dr. McDonald moved Mr. Tuer into an operating room and placed him on a heart-lung machine. Dr. McDonald then operated on Mr. Tuer in an effort to correct Mr. Tuer's cardiac condition. Mr. Tuer survived

the surgery, but because of his deteriorated heart condition, he died the next day of a myocardial infarction.

Following the death of her husband, Mrs. Tuer, both individually and as the personal representative of her husband's estate, filed a negligence claim with the Health Claims Arbitration Office against appellees and St. Joseph Hospital, Inc. Mrs. Tuer claimed that appellees' and St. Joseph Hospital's negligence caused the death of Mr. Tuer. On August 24, 1994, all the parties agreed to waive the arbitration claim.

On August 26, 1994, Mrs. Tuer filed a four count complaint in the circuit court. The circuit court dismissed St. Joseph Hospital, Inc. as a defendant. On September 13, 1995, after a trial on the merits, the jury found for appellees. Mrs. Tuer filed a motion for a new trial, which the circuit court denied without a hearing. After the circuit court denied her motion for a new trial, Mrs. Tuer filed this timely appeal.

## DISCUSSION

### I.

Mrs. Tuer argues that the circuit court erred by not admitting evidence that, subsequent to Mr. Tuer's death, appellees changed their surgical procedures and halted their practice of discontinuing the drug Heparin to patients with Mr. Tuer's clinical condition prior to surgery. Specifically, Mrs. Tuer insists that appellees' change in procedure, which qualifies as a subsequent remedial measure under Maryland Rule 5–407, was admissible (1) to prove the feasibility of restarting Heparin; and (2) as evidence to impeach Dr. McDonald's credibility. Appellees counter that the circuit court correctly excluded the subsequent remedial measure because feasibility was not contested, and it did not constitute impeachment evidence.

This case, like several cases that have come before this Court since the Court of Appeals adopted the New Maryland Rules of Evidence in 1994, requires this Court to interpret a rule of evidence that closely resembles a federal rule analogue.

Maryland Rule 5–407, which discusses the admission of subsequent remedial measures, reads as follows:

(a) In General.—When, after an event, measures are taken which, if in effect at the time of the event, would have made the event less likely to occur, evidence of the subsequent measure is not admissible to prove negligent or culpable conduct in connection with the event.

(b) Admissibility for Other Purposes. This Rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Maryland Rule 5–407 follows the Federal Rule 407[1] with only minor stylistic changes. Lynn McLain, *Maryland Rules of Evidence* at 13 (1994); *see also* Alan D. Hornstein, *Maryland Rules of Evidence* 51 Md.L.Rev. 1032, 1051 (1995) (stating that Rule 5–407 is substantively the same as Federal Rule 407). Additionally, Rule 5–407, by not including that subsequent remedial evidence is admissible to prove the standard of care, overruled *Wilson v. Morris*, 317 Md. 284, 563 A.2d 392 (1989) and existing Maryland law, which previously held that subsequent remedial evidence was admissible to prove the standard of care.

The rule against admitting evidence of subsequent remedial measures, as articulated by Federal Rule 407 and Maryland Rule 5–407, is based on several policy considerations. Primarily, the rule for excluding subsequent remedial measures is based on safety concerns. As Judge Richard Posner explained, "A major purpose of Rule 407 is to promote safety by removing the disincentive to make repairs (or take other

---

1. Federal Rule 407 reads as follows:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment.

safety measures) after an accident that would exist if the accident victim could use those measures as evidence of the defendant's liability." *Flaminio v. Honda Motor Co.*, 733 F.2d 463, 467 (7th Cir.1984); *accord Rimkus v. Northwest Colorado Ski Corp.*, 706 F.2d 1060, 1064 (10th Cir.1983); *Werner v. Upjohn, Co.*, 628 F.2d 848, 857 (4th Cir.1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981); McLain, *supra*, § 2.407.5, at 110.

Professor McLain describes additional policy considerations as follows:

(1) The evidence has *low probative value* with regard to negligence or fault. . . .

. . . .

(3) To the extent that evidence of subsequent remedial measures is not probative of fault—and to the extent that the evidence may suggest that defendant believes that it had earlier not met the standard of due care—there is also the likelihood of *confusion of the jury* and *unfair prejudice*.

McClain, *supra*, § 2.407.5, at 110 (emphasis in original). The rule excluding subsequent remedial evidence rejects the old saw that "because the world gets wiser as it gets older, therefore it was foolish before," *Hart v. Lanceshire & Yorkshire Ry. Co.*, 21 L.T.R.N.S. 261, 263 (1869).

The wording of Rule 5–407, coupled with the policies underlying the exclusion of subsequent remedial measures, evince an exclusionary approach that rejects the standard articulated by *Wilson*. Under this exclusionary approach, courts may only admit evidence of subsequent remedial measures to establish feasibility or to impeach a witness's credibility. The exclusionary approach serves as a beacon, which warns courts that they "must exercise caution so as to avoid allowing the subsequent repair evidence when the offering party is essentially manufacturing an issue to waft the subsequent repair

evidence before the jury." David P. Leonard, *The New Wigmore, A Treatise on Evidence* § 2.8.1, at 2.116 (1996).[2]

Both this Court and the Court of Appeals have in the past used federal case law to interpret Maryland Rules of Evidence that closely resemble their federal counterparts. Accordingly, in this case we shall follow suit and use federal cases that discuss Federal Rule 407 to aid us in our interpretive mission.

## A. Feasibility

Appellant argues that appellees' change in procedure in administering Heparin was admissible under Rule 5–407's feasibility exception. Appellees insist that the feasibility in administering Heparin was never contested during the trial. Before this Court can determine whether feasibility was contested, however, we need to determine what the term feasibility means within the context of Rule 5–407.

Defining feasibility within the context of Rule 5–407 requires that we adopt one of two divergent approaches. The first option is the narrow approach that follows the plain meaning of feasibility. *Webster's Third New International Dictionary* 831 (1976) defines the term feasible as "capable of being done, executed, or effected: possible of realization." *Accord American Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 508–509, 101 S.Ct. 2478, 2490–2491, 69 L.Ed.2d 185 (1981) (adopting the *Webster's* definition of feasible within the context of 29 U.S.C. § 655(b)(5)). Thus, under the narrow approach, the key question to ask is whether the subsequent remedial measure *could have been instituted. See, e.g.,* Leonard, *supra,* § 2.8.3, at 2:123–127; *see also Gauthier v. AMF, Inc.,* 788 F.2d 634, 637–638, *modified,* 805 F.2d 337 (9th

---

2. Mrs. Tuer argues that the public policy foundations that underlie Rule 5–407 are not applicable in this case. To support this argument, Mrs. Tuer points out that the events of this case occurred before the July 1, 1994 adoption of the new Maryland Rules of Evidence. It is enough to say that Rule 5–407 is applicable because this case was tried after it became effective. Thus, because Rule 5–407 is applicable, the policies underlying the exclusion of subsequent remedial measures are equally at play.

Cir.1986); *Flaminio,* 733 F.2d at 468; *Werner v. Upjohn Co., Inc.,* 628 F.2d 848 (4th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981) (discussing feasibility in terms of economic and technological possibilities).[3]

The other option defines feasibility more broadly. Under the broad approach, feasibility not only means "possible," but also means "capable of being utilized or dealt with successfully." *Anderson v. Malloy,* 700 F.2d 1208, 1213 (8th Cir., 1983) (quoting the second definition listed in *Webster's Third New International Dictionary* 831 (1976)). The broad approach allows more subsequent remedial evidence to be admitted, and has only been adopted by one federal circuit. *Anderson,* 700 F.2d at 1213.

This Court must interpret a rule or statute in accordance with its goals and purposes. *Rose v. Fox Pool Corp.,* 335 Md. 351, 359, 643 A.2d 906 (1994). Of the contrasting approaches presented to this Court, the narrow approach is more consistent with the policy underlying the exclusion of subsequent remedial evidence. Rule 5–407 operates to keep subsequent remedial evidence away from the jury except when parties contest that a certain remedial measure could not have been taken.

The broad approach, on the other hand, is fatally flawed. First, it blurs the line between the offer of subsequent remedial evidence to prove negligence and culpability, which is never allowed, and subsequent remedial evidence that establishes feasibility, which is only allowed when it is contested. The criteria used to determine whether something is feasible under the broad approach and whether a party is culpable are similar. This similarity causes problems differentiating between feasibility and culpability. The danger inherent in

---

3. Professor McLain includes the following hypothetical to illustrate when feasibility is contested: "[E]vidence that the defendant has built a fence would not be excluded by Rule 5–407 if the defendant contended that a fence could not be built, *i.e.,* controverted feasibility." Lynn McLain, *Maryland Rules of Evidence* § 2.407.5, at 112 (1994).

blurring the distinction between feasibility and culpability is expressed as follows:

> Still, the distinction is extremely subtle, and because the subsequent repair evidence tends to prove the same element of the claim that it would be used to prove if offered for its forbidden purpose [culpability], there is significant danger that the party against whom it is offered will be prejudiced by its admission. . . . [W]hen offered to prove feasibility of precautionary measures, subsequent repair evidence more closely approaches the forbidden purpose. Jurors can be expected to have significant difficulty distinguishing between the permissible and impermissible uses of subsequent repair evidence.

Leonard, *supra*, § 2.8.3, at 2:124–125.

The broad approach's second deadly flaw is its inconsistency with basic tenets of statutory construction. The rules of construction are not literary tools intended to create subtle or forced definitions that run contrary to a statute's or rule's purpose. *See Ayres v. Townsend*, 324 Md. 666, 672, 598 A.2d 470 (1991); *Jones v. State*, 311 Md. 398, 405, 535 A.2d 471 (1988); *see also State Dep't of Assessments and Taxation v. Belcher*, 315 Md. 111, 119, 553 A.2d 691 (1989) (stating that the rules of construction should not be used to frustrate a legislative objective). In this case, the broad approach stretches the definition of feasibility beyond its ordinary meaning and establishes a definition that works against the exclusionary function of Rule 5–407.

The practical effect of the broad approach is to circumvent the exclusionary policy, breathe life into the overturned standard articulated in *Wilson v. Morris*, 317 Md. 284, 563 A.2d 392 (1989), and allow prejudicial subsequent remedial evidence before the jury. We refuse to manipulate the canons of construction in a way that would operate as an end run on Rule 5–407.

Mrs. Tuer predicated her claim on proving that appellees' standard of care as of November 2, 1992 was negligent. Introducing evidence that, after Mr. Tuer died, appellees

changed their procedure for administering Heparin to prove
that it could have been administered to Mr. Tuer successfully
would help establish appellees' negligence.

In the case *sub judice*, there is no evidence that, at
trial, appellees contested whether Heparin could have been
restarted. In her brief, Mrs. Tuer admits that no defense
witness testified that Heparin could not have been restarted.
The testimony at trial supports Mrs. Tuer's concession and
reveals that appellees and defense witnesses recognized that
Heparin could have been restarted, but that Dr. McDonald did
not restart Heparin because he believed the risks outweighed
the benefits.

Specifically, Dr. McDonald testified that, even though it was
possible to restart Heparin, he rejected the idea. During
cross-examination, Dr. McDonald testified as follows:

Q. I am also correct, Doctor, you did not consider starting
heparin at the time you postponed Mr. Tuer's surgery?

A. No, sir. You are not correct.

Q. You did consider it?

A. I am sure I would have considered it.

Q. And?

A. Heparin is a very important drug for a heart surgeon.
We have used it every single day in every single patient
and I am very familiar with the facts. The oversight in
placing a patient on cardiopulmonary bypass would be a
catastrophe. So I am sure I considered heparin and
elected not to restart and there is a very sound reason
for that.

. . . .

Q. So, in essence, what we—you do again when you are
making this election to restart Heparin is to balance
the—

A. The—that's—

Q. —the benefits of restarting Heparin against the risk of
an inadvertent carotid artery puncture, correct?

A. That is precisely what we did, and attempt to do with respect to this problem.

Additionally, defense witnesses Dr. Stuart, Dr. Nyhan, and Dr. Fortuin all testified about the medical risks of restarting Heparin. Their testimony presumed that Heparin could have been started, but that, based on their medical opinions, its risks outweighed its benefits.

Mrs. Tuer insists that "feasibility was controverted by virtue of 'inferences' drawn from the defense's testimony." Arguing that a party chose not to perform a certain action because of the risk involved, however, is different than arguing that a party did not perform a task because it was physically unable to actually accomplish the task. As discussed *supra*, "Where a defendant argues about the trade-off involved in precautionary measures, it is not placing feasibility in issue." *Gauthier v. AMF, Inc.*, 788 F.2d 634, 638 (9th Cir.1986); *accord Flaminio v. Honda Motor Co.*, 733 F.2d at 468.[4]

### B. Impeachment

Mrs. Tuer argues that the change of procedure after Mr. Tuer's operation undermines Dr. McDonald's credibility with respect to his testimony that "it would have been unsafe to restart Mr. Tuer's heparin" after Mr. Tuer's surgery was postponed. Appellees counter that the subsequent change in procedure was not appropriate impeachment evidence.

Generally, impeachment evidence is used to attack the credibility of a witness by questioning a witness's personal veracity or the reliability of his testimony. *See Smallwood v.*

---

**4.** In her reply brief, Mrs. Tuer points out that Appellees' counsel objected both times that a direct question was put to a defense witness. Mrs. Tuer goes on to pose the question, "If feasibility wasn't controverted, then what harm could there have been in answering a question concerning feasibility?" The harm is self evident; an answer would have undermined appellees' case by introducing subsequent remedial evidence to the jury where none was warranted. The question itself is based on the mistaken view that subsequent remedial evidence is not unfairly prejudicial.

*State,* 320 Md. 300, 307, 577 A.2d 356 (1990). Parties, however, are not allowed to use impeachment evidence as a ruse to get substantive evidence before the jury that the rules of evidence otherwise prohibit. *See Bradley v. State,* 333 Md. 593, 600, 636 A.2d 999 (1994).

■ In the context of subsequent remedial measures, mere contradictory testimony is not enough to warrant the admission of subsequent remedial measures for impeachment purposes.[5] "If 'impeachment' means simple contradiction, then the impeachment exceptions to Rule 407 would threaten to swallow the Rule itself." 1 Stephen A. Saltzburg et. al., *Federal Rules of Evidence Manual* p. 487 (6th ed. 1994, 1996 Cum.Supp.). Thus, in order to avoid having the impeachment exception swallow Rule 407 like the great fish swallowed Jonah, courts have required more than mere contradiction in order to allow subsequent remedial measures to be used for impeaching a witness's credibility. *See, e.g., Wood v. Morbark Indus., Inc.,* 70 F.3d 1201, 1207–1208 (11th Cir.1995); *Harrison v. Sears, Roebuck & Co.,* 981 F.2d 25, 31–32 (1st Cir.1992); *Kelly v. Crown Equipment Co.,* 970 F.2d 1273 (3rd Cir.1992); *Flaminio,* 733 F.2d at 468.

Parties may use subsequent measures to affect the credibility of a witness by showing "that the witness is wrong or spoke dishonestly with respect to the particular fact (here, that the condition was safe or had not been changed)." Leonard, *supra,* at 2:130.[6] Additionally, when a defendant testifies in a superlative nature, *e.g.,* that "this is the safest practice known to medicine," subsequent remedial evidence provides more than mere contradiction and can, thereby, be used for im-

---

**5.** Impeachment to prove a contradiction occurs "when evidence is introduced suggesting that a fact to which the witness testified is not true." 27 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6096, at 538 (1990).

**6.** Other forms of impeachment where parties can use subsequent remedial evidence include impeachment by prior inconsistent statement, bias, interest, or to demonstrate defects in the witness's ability to perceive or recollect. David P. Leonard, *The New Wigmore, A Treatise on Evidence* § 2.8.4, at 2:134–136 (1996).

peachment purposes. Saltzburg, *supra*, at 487; *see also Wood*, 70 F.3d at 1207–1208; *Muzyka v. Remington Arms Co.*, 774 F.2d 1309, 1313 (5th Cir.1985).

█ In this case, the change in administering Heparin prior to surgery had no bearing on Dr. McDonald's credibility as a witness. In order to impeach Dr. McDonald's statement, Mrs. Tuer had to demonstrate that Dr. McDonald thought that it was safe to restart Heparin. Instead, Dr. McDonald's statement evinces a doctor and a hospital that, as of November 2, 1992 and based on the scientific data and their professional opinion, believed that the risks of restarting Heparin outweighed the benefits. Additionally, Dr. McDonald's statement lacks the superlative tone that would otherwise warrant admitting subsequent remedial evidence for impeachment purposes.

## II.

During the cross examination of Dr. McDonald the following transpired:

Q. Doctor, prior to November 2nd, 1992, in your practice of cardio thoracic surgery at Saint Joseph Hospital, were there any circumstances under which a patient with Mr. Tuer's clinical profile, and that being unstable angina, stabilized in the hospital for a period of time with heparin therapy, awaiting coronary artery bypass surgery, would not have had the heparin discontinued three to four hours prior to the surgery?

A. I don't believe so, because that was our policy at that time. It would have been a departure, and sitting here this morning I just can't think of a reason off hand why that could be.

Mrs. Tuer argues that the circuit court erred by not allowing her to introduce the medical records of Kenneth Glauber to impeach Dr. McDonald about the above referenced answer. Appellees counter that the circuit court correctly excluded the medical records because the records were not relevant.

■ Evidence is only admissible if it is relevant. Md. Rule 5–402. Impeachment evidence is relevant if it affects a witness's credibility. *See Smallwood v. State,* 320 Md. 300, 307, 577 A.2d 356 (1990) (stating that impeachment evidence is used to attack a witness's credibility). Additionally, a trial court's exclusion of evidence based on lack of relevancy should not be disturbed unless the finding was an abuse of discretion. *Holt v. State,* 50 Md.App. 578, 581, 438 A.2d 1386 (1982).

■ In this case, in order for Mr. Glauber's medical records to be relevant to impeach Dr. McDonald's statement, the clinical profiles of Mr. Tuer and Mr. Glauber needed to be similar. Mrs. Tuer, however, never established that Mr. Glauber and Mr. Tuer had the same clinical profile.

In fact, the record reveals that Mr. Glauber's clinical profile was significantly different from Mr. Tuer's clinical profile. Mr. Glauber was admitted to St. Joseph Hospital with a left main stenosis. He arrived via an ambulance and was already on Heparin. His condition was so severe that he required surgery within twenty-four hours of being admitted. Thus, because the two patients had significantly different clinical profiles, Mr. Glauber's medical records were neither relevant nor proper for impeachment.

### III.

Mrs. Tuer insists that the circuit court erred by preventing her from introducing a rebuttal witness. Specifically, Mrs. Tuer wanted to introduce Dr. Schwartz to discuss the risks associated with carotid artery punctures. Appellee maintains that Mrs. Tuer was not entitled to introduce rebuttal evidence on the puncture issue because she raised the issue first in her case-in-chief.

■ The Court of Appeals articulated the standard for determining what constitutes rebuttal evidence as follows:
> When the defendant has concluded his testimony, the plaintiff, in those cases where the burden of proof rests on him and where in chief he has accordingly gone into his whole case, is entitled to introduce what is called rebuttal evi-

dence-that is to say, evidence in regard to such new points and questions as were first opened by defendant's evidence. *Jones v. State*, 132 Md. 142, 148, 103 A. 459 (1918); *accord Fairfax Savings v. Ellerin*, 94 Md.App. 685, 688, 619 A.2d 141 (1993), *rev'd on other grounds*, 337 Md. 216, 652 A.2d 1117 (1995); *see also State v. Hepple*, 279 Md. 265, 270, 368 A.2d 445 (1977) (stating that rebuttal evidence is "any competent evidence which explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the defense"). The determination of what constitutes rebuttal evidence rests within the sound discretion of the trial court. *Id.; Ellerin*, 94 Md.App. at 698, 619 A.2d 141.

In this case, the issue of carotid artery punctures was first raised by Mrs. Tuer, not appellees. Mrs. Tuer's whole case was based on establishing that the risks of restarting Heparin were less than the risks of puncturing the carotid artery. Testimony in Mrs. Tuer's case-in-chief discussed the balance between restarting and not restarting Heparin. Accordingly, there is nothing in the record that supports a finding that the circuit court abused its discretion by not allowing Dr. Schwartz to testify.

**JUDGMENT AFFIRMED.**

**APPELLANT TO PAY COSTS.**