884 A.2d 678

Warren THOMPSON

v.

STATE of Maryland.

No. 668, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Oct. 5, 2005.

Brian M. Saccenti (Nancy S. Forster, Public Defender, on brief), for appellant.

Gregory D'Allesandro (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel MURPHY, C.J., EYLER, JAMES R., and BARBERA, JJ.

EYLER, JAMES R., J.

Warren Anthony Thompson, appellant, was convicted by a jury in the Circuit Court for Baltimore City of first-degree assault; second-degree assault; reckless endangerment; use of a handgun in the commission of a felony or crime of violence; wearing, carrying, or transporting a handgun; and possession of a regulated firearm after having been convicted of a disqualifying crime.[1] The jury acquitted appellant of attempted first-degree murder and attempted second-degree murder. After denying appellant's motion for a new trial, the court sentenced appellant to twenty-five years' imprisonment for assault in the first-degree, the second-degree assault and reckless endangerment counts merging; fifteen years' imprisonment for using a handgun in the commission of a felony or crime of violence, the wearing, carrying, or transporting a handgun count merging; and a concurrent five-year sentence for possession of a regulated firearm after having been convicted of a crime.

On appeal, appellant contends that the court erred 1) in giving the jury a flight instruction; 2) by prohibiting defense counsel from eliciting that appellant was previously acquitted of assaulting two of the State's witnesses; and 3) in denying appellant's motion to suppress the out-of-court photographic identification by a witness. Perceiving no error, we shall affirm.

## Factual Background and Procedural History

On the evening of July 17, 2002, Noah Gottesman, William Beaver, and Bradley Kelly were walking to their hotel near the Inner Harbor when they were approached by two men on a bicycle. One of the men on the bicycle, later identified as

---

1. As will become clear, appellant was convicted on re-trial after a jury at the first trial was unable to reach a verdict with respect to the pertinent charges.

appellant, said to the group, "I'll make this easy. Put your wallets on the ground." Not realizing that appellant had a gun, the three men kept walking. As they passed appellant, Mr. Kelly noticed that appellant was pulling a gun out of his pocket or waistband. At that point, Mr. Kelly yelled to Mr. Beaver and Mr. Gottesman to run. As they ran, they heard between five and eight shots fired in their direction, and Mr. Gottesman screamed that he had been shot.[2] As they reached the end of the block, a car stopped and they were told to get in. The two men inside the car drove them to the emergency room.

At the hospital, the three men were met by a police officer, to whom they gave a description of the shooter. Subsequently, a description was broadcast over the police radio that the shooter was a black male on a bicycle, approximately 25 years old, with corn rows, a baggy white t-shirt, and jeans or jean shorts.

Detective Frank Mundy of the Baltimore City Police Department responded to the scene of the shooting. While at the scene, Detective Mundy saw appellant, who matched the description of the shooter and was riding a bicycle. Detective Mundy started to run towards appellant, calling out for him to stop. Appellant saw Detective Mundy and started pedaling away. Although Detective Mundy lost sight of appellant, appellant was apprehended within five minutes by other police officers and taken to the police station.

Later that night, Mr. Kelly, Mr. Beaver, and Mr. Gottesman went to the police station to give statements and to view a photographic array. Mr. Kelly and Mr. Beaver both identified appellant as the shooter from the photo array. Mr. Gottesman was not able to identify appellant from the photo array.

## I. *The first trial*

Appellant was originally charged in three separate indictments with, *inter alia*, attempted murder, assault, and use of a

---

2. Mr. Gottesman was shot in his right arm.

handgun against Mr. Kelly, Mr. Beaver, and Mr. Gottesman. Appellant was also charged with possession of a controlled dangerous substance. Following his arrest, appellant, in a tape-recorded statement, explained to police the reason for his presence at the scene as follows.

[APPELLANT]: I was riding my bike I was coming from my house . . . and . . . I observed . . . police officer's pulling [a] couple of people over I thought it was a[n] accident, actually I thought it was a car accident and farther up in the next block, it was some more police officers um and I just rode though [sic]. On my way back police officer pulled me over and um I ride *because I was dirty.*

\* \* \*

DETECTIVE: When you say you ran because you was dirty, what was you carrying?

[APPELLANT]: Um, crack cocaine, probably cocaine.

(Emphasis added). The police had in fact recovered 86 vials of cocaine from appellant upon his arrest. Before trial, however, the circuit court suppressed evidence of the drugs, apparently because of a break in the chain of custody. Thus, the State did not seek to prosecute appellant on the possession charge. Appellant's taped confession was allowed into evidence. However, at appellant's request, the court redacted the portions of the statement relating to the drugs, because of their prejudicial nature.

Prior to trial, on March 10, 2003, a motions hearing was held. At the hearing, appellant challenged the admissibility of Mr. Kelly's pre-trial identification of appellant. Specifically, appellant argued that the array was "unnecessarily suggestive," as it contained only one photograph—appellant's—where the individual was wearing a "white t-shirt." In support of this motion, appellant proffered the testimony of Detective Michael Debord of the Baltimore City Police Department. Detective Debord testified that, at 11:46 p.m. on July 17, 2002, Mr. Kelly gave a description of the shooter "as being a black male, under 25, 5'10 to 5'9, 160, 165 pounds, white shirt, baggy jeans and dreadlocks or corn rows." At 12:09 a.m. on July 18,

2002, Mr. Kelly, as a witness to the shooting, was shown a photographic array containing the photographs of six black males. The instructions on the back of the array, given to Mr. Kelly before the photo array was shown, provided as follows:

This group of photographs may or may not contain the picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards and mustaches may easily be changed. Also, photographs may not always depict the true complexion of a person. Complexion may be lighter or darker than shown in the photo. When you've looked at all the photos tell me whether or not you see the person who committed the crime. Do not tell other witnesses you have or have not identified anybody.

Appellant's counsel[3] asked Detective Debord about the clothing worn by the subjects in the photo array, and the following occurred.

[APPELLANT'S COUNSEL]: Okay. And out of those six photographs could you tell the court who is the—which gentleman [sic] are in white T-shirts? You can do it by numbers.

DETECTIVE DEBORD: Number two has a white T-shirt. Number four has a white T-shirt. Number five has a white tank top T-shirt.

[APPELLANT'S COUNSEL]: Okay. But as far as the description of Mr. Kelly goes, did Mr. Kelly describe a tank T-shirt?

DETECTIVE DEBORD: No.

[APPELLANT'S COUNSEL]: He described a white T-shirt, is that correct?

DETECTIVE DEBORD: Yes. Yes, ma'am.

[APPELLANT'S COUNSEL]: And as far as the only individual who is wearing a white T-shirt without a jacket over it it's number two, is that correct?

DETECTIVE DEBORD: Yes, ma'am.

---

3. Appellant's counsel at trial is not the same as on appeal.

[APPELLANT'S COUNSEL]: Okay. Were you present when Mr. Kelly made a statement on the—wrote a statement on the back of that photo array?

DETECTIVE DEBORD: Yes.

[APPELLANT'S COUNSEL]: Do you have a copy of that?

DETECTIVE DEBORD: Yes, ma'am.

[APPELLANT'S COUNSEL]: And you were there when Mr. Kelly wrote down the statement, is that correct?

DETECTIVE DEBORD: Yes, I was.

[APPELLANT'S COUNSEL]: Could you read that statement into the record?

DETECTIVE DEBORD: "I believe it's number two because I recognize his facial features and the white T-shirt."

[APPELLANT'S COUNSEL]: And the white T-shirt, is that correct?

DETECTIVE DEBORD: Yes, ma'am. Yes, ma'am.

[APPELLANT'S COUNSEL]: Okay. Had you told Mr. Kelly when this picture of [appellant] was taken?

DETECTIVE DEBORD: No.

[APPELLANT'S COUNSEL]: Did you tell him that it was taken that day or sometime previously?

DETECTIVE DEBORD: No.

[APPELLANT'S COUNSEL]: So Mr. Kelly basically described this gentleman on behalf of his—by his facial features and his white T-shirt, is that correct?

DETECTIVE DEBORD: That's what he wrote down, yes.

[APPELLANT'S COUNSEL]: Were there any other people in the room when Mr. Kelly made this identification?

DETECTIVE DEBORD: Just Detective Mundy and I.

[APPELLANT'S COUNSEL]: Did Mr. Kelly have reason to believe that any suspect had been arrested in this case?

DETECTIVE DEBORD: No.

On cross-examination, Detective Debord testified to the following.

THE STATE: Detective, who assembled this photo array?

DETECTIVE DEBORD: I did.

THE STATE: Okay. Any why—can you tell us part of your reasoning that goes into assembling a photo array?

DETECTIVE DEBORD: Well, you get photographs to try to find other photographs that meet the same general description to try to get close to age. I mean, you don't want somebody with a real big face and a real—you don't want to have somebody with a real large face and then put him in with arrays with people—try to—try to get their description as close as you can, but not too close to confuse the witnesses.

THE STATE: And you did that based upon their facial features, correct?

DETECTIVE DEBORD: Yes.

THE STATE: You do it based on their hairstyles, correct?

DETECTIVE DEBORD: Yes.

THE STATE: Do you do it based on their clothing description?

DETECTIVE DEBORD: No, I try not to, no.

The court denied appellant's motion to suppress the photo array identification by Mr. Kelly, stating:

Motion is denied. The burden of proof in these sorts of matters is on the Defense to make a prima facie case that the pretrial procedure was—and here's where I part from you, [appellant's counsel]—was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Citing *Jones v. State*, 310 Md. 569, 530 A.2d 743. That's a 1986—1987 case. And *Lowd [sic] versus State* 63 Maryland App 702, a 1985 case which has that—both of which have that holding.

Now, in this case we have a photo array. It has six photos in it. Two of the photos have people in white T-shirts and one photo [h]as a person in a white T-shirt with a blue pullover. So, you can speculate, you can argue that there really are three people here, three men in white T-shirts.

On the other hand, the witness clearly said that he recognized the [appellant], photo number two from facial features.

\* \* \*

The witness clearly said that he recognized the [appellant] and that is photo number two. Not only from the white T-shirt, but from some facial features. But the issue here is whether the procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification.

I don't think it was because I think—as I say, [appellant] in picture number two is identified by facial features plus the white T-shirt with special emphasis on the white T-shirt and I don't think that's [im]permissibly suggestive. Motion is denied.

Ultimately, the jury acquitted appellant of the counts of first-degree assault and second-degree assault relating to Mr. Beaver and Mr. Kelly, and they were unable to reach a verdict as to any of the remaining counts.

## II. *The second trial*

The State retried appellant only on the indictment relating to Noah Gottesman, which is the subject of this appeal.

Prior to the second trial, appellant's counsel moved to have the court allow her to inform the jury that appellant had previously been acquitted of assaulting Mr. Kelly and Mr. Beaver—both of whom would testify at trial—and that the remaining charges against appellant relating to the two witnesses had been nol prossed. Appellant's counsel argued:

I [should] at least be allowed to address the jury and tell them that [appellant] was, in fact, found not guilty in a previous trial of first—and second-degree assault of these two other gentlemen who are going to testify and that the State has dismissed the rest of the charges against [appellant] relating to those two individuals. I think I have the right to do that.

The court denied the motion on the ground that this information was irrelevant.

During trial, at a bench conference at the end of recross-examination of Mr. Kelly, appellant's counsel again requested that the court allow her to elicit information regarding the prior acquittals. The following occurred.

[APPELLANT'S COUNSEL]: Your Honor, I know you made a previous ruling that I could not ask about the previous trial—

THE COURT: You asked about the transcript. That's fine.

[APPELLANT'S COUNSEL]: But I would like to cross-examine this witness about what happened in that previous trial. I think it goes to motive and bias (inaudible).

THE COURT: What about it?

[APPELLANT'S COUNSEL]: It also goes to—

THE COURT: What about what happened?

[APPELLANT'S COUNSEL]: That, basically, my client was found not guilty of assaulting this individual.

THE COURT: No, we're not doing that. No. Denied.

[APPELLANT'S COUNSEL]: Especially because the [State] opened the door by mentioning the previous [testimony]—

THE COURT: You brought it up. I allowed you to ask him about the transcript. You ask[ed] him what he said, but you can't ask him about the verdict, no, no, no. Okay? Don't do it.

[APPELLANT'S COUNSEL]: I object, Your Honor. I'm just noting it for the record.

THE COURT: I know. So noted.

During direct examination of Mr. Beaver, the issue of the previous acquittals was again raised:

[APPELLANT'S COUNSEL]: Your Honor, I'm protesting that these two witnesses who are testifying, I won't be able to adequately cross-examine them as to motive, bias, and also other crimes evidence, and the fact that—

THE COURT: Oh, so that's your issue.

THE STATE: Oh, okay.

THE COURT: Because we're not discussing the prior trial.

[APPELLANT'S COUNSEL]: Unless he opens the door.

THE COURT: Well, even if he discusses, he mentions there was a proceeding, that's not the same as discussing the verdict.

THE STATE: Or if counsel cross-examines him on what he specifically said, that's not opening the door.

THE COURT: Right, but you can cross-examine him on what he said the last time, or even any proceeding that he discussed this matter.

[APPELLANT'S COUNSEL]: Right. Your Honor, the basis was the verdict, so the jury knows that—

THE COURT: I know. We're not doing that.

THE STATE: I just wanted to make sure—

THE COURT: Ask the witness to come up here. Tell him to come up here. Come here. Come here.

MR. BEAVER: Oh, okay.

MR. BEAVER: Yes?

THE COURT: During the course of your testimony, you may not discuss the outcome of any prior proceeding. Do you understand that?

MR. BEAVER: Okay.

THE COURT: You've testified in this matter before, right?

* * *

THE COURT: You may be asked about what you may have said on other occasions in this case.

* * *

MR. BEAVER: (Nods head affirmatively).

THE COURT: I don't want you to discuss anything other than that it was in another proceeding. I don't want you to discuss what happened in those cases in terms of the outcomes.

* * *

THE COURT: And you can be asked about what you said, all right, at another proceeding, all right, but don't refer to it as another "trial," do not discuss the fact that it was a trial or what the outcome was. Do you understand?

MR. BEAVER: I believe so. Yeah.

\* \* \*

[APPELLANT'S COUNSEL]: I object for the record, Your Honor.

THE COURT: Fine. So noted....

In the second trial, the State did not seek to introduce evidence of the cocaine. Thus, appellant's tape-recorded statement to police that was played for the jury, as well as a transcript of the statement that was prepared as an aid for the jury, were altered, as in the first trial, to omit appellant's assertion as to why he ran from the police. The altered statement was as follows.

I was riding my bike I was coming from my house ... and ... I observed ... police officer's pulling couple of people over I thought it was a[n] accident, actually I thought it was a car accident and farther up in the next block, it was some more police officers um and I just rode though [sic]. On my way back police officer pulled me over *and um I ran.*

(Emphasis added).

To the extent pertinent, Officer Mundy testified as follows.

THE STATE: Where were you when you first saw the [appellant]?

OFFICER MUNDY: I was in the 1100 block of East Pratt Street.

THE STATE: Where was he?

OFFICER MUNDY: He was on a bicycle heading—I guess it would be westbound on the 1100 block of East Pratt Street.

\* \* \*

THE STATE: Okay. When you saw the [appellant] on the bicycle, what did you do?

OFFICER MUNDY: We had a basic description of what the suspect was supposed to have looked like. The [appellant] matched that description. You know, I looked at my partner because we both thought, you know—

\* \* \*

THE STATE: What did you personally do?

OFFICER MUNDY: I attempted to approach the [appellant].

THE STATE: Okay. Did you walk toward him?

OFFICER MUNDY: Well, I had to run up to him because he was pedaling a bicycle away.

THE STATE: Okay. Did you say, "Stop, police"?

OFFICER MUNDY: Well, what happened was, when I started running up towards him, he turned around and saw me, and he started to pedal away faster, and I did yell at that point to stop.

THE STATE: Okay. Before he saw you—I mean, before he started to pedal away, when you first approached him, did you have your gun drawn?

OFFICER MUNDY: No.

THE STATE: Did you say, "Stop, police"?

OFFICER MUNDY: No, I don't think I did.

THE STATE: Okay. As he pedaled away, what did you do?

OFFICER MUNDY: What, after he saw me?

THE STATE: Yes.

OFFICER MUNDY: After he saw me and he pedaled away, I called it out to try to get him stopped. I did tell him at that I was the police, to stop.

THE STATE: Okay. When he was pedaling away, was he going slowly or fast?

OFFICER MUNDY: He was going fast.

THE STATE: And he was on the bicycle at this time?

OFFICER MUNDY: Yes.

During the bench conference that preceded jury instructions, the State requested a flight instruction based on appel-

lant's recorded statement and Officer Mundy's testimony, and the following colloquy occurred.

THE STATE: The State would also ask for [Maryland Pattern Jury Instruction—Criminal] 3:24, which is flight of the defendant.

[APPELLANT'S COUNSEL]: I would like to be heard on that, Your Honor.

THE COURT: Sure.

[APPELLANT'S COUNSEL]: Your Honor, the previous motion suppressed drugs that allegedly were found on [appellant's] person—[appellant's] person—and in his statement which was redacted from the jury, he says basically, "I ran because I was dirty." That was redacted. Now, if you let this flight instruction in front of the jury, they're going to think that he ran because he committed the shooting, not perhaps the real reason: he ran because he was dirty. That was kept from the jury and I think this is misleading, given the facts that the jury actually did hear.

THE COURT: Well, the instruction says, "Flight under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence," or at least innocence of this crime.

[APPELLANT'S COUNSEL]: I can't think, even though you are reading that in a light that's helpful to the defense, if any defense attorney has ever asked for a flight instruction, Your Honor. I definitely believe—

THE COURT: No, why would the defense ask for a flight instruction. No, I know, that's true.

[APPELLANT'S COUNSEL]: No, I think the State wants this because it's going to say he ran because he's the shooter and that's not—

THE COURT: Well, that is a permissible inference that they could draw from the evidence, but there's other inferences and that's explained right in there. I mean, frankly, it's a judgment call. I mean, you could have let go into evidence this other issue as an explanation for why he ran

away. I mean, you balance the equities and you make a decision.

[APPELLANT'S COUNSEL]: I just said if this jury instruction is taken in light of the facts this jury actually heard, it's misleading.

THE COURT: I don't think so. Overruled.

Ultimately, the jury was instructed as follows.

A person's flight or concealment immediately after the commission of a crime or after being accused of committing a crime is not enough to establish guilt, but it is a fact that may be considered by you as evidence of guilt.

*Flight under these circumstances may be motivated by a variety of factors, some of which may be fully consistent with innocence.* You must first decide whether there's evidence of flight. If you decide there's evidence of flight, you must then decide whether this flight shows a consciousness of guilt.

(Emphasis added). At the conclusion of jury instructions, appellant noted an objection to the flight instruction.

## Parties' Contentions

Appellant contends that the trial court erred in giving the jury a flight instruction. In support of this contention, appellant asserts that he had a reason for fleeing from police that had nothing to do with the shootings, specifically, that he was in possession of a substantial amount of cocaine. Therefore, appellant's flight was not based on a consciousness of guilt of the shootings, but on a consciousness of guilt of illegal possession of cocaine. Because evidence of appellant's cocaine possession was suppressed, appellant contends that the jury was likely to infer that his flight was evidence of guilt of the shooting.

Appellant's second contention is that the trial court erred by prohibiting appellant's counsel from eliciting that appellant was previously acquitted of assaulting Mr. Kelly and Mr. Beaver and that the State had nol prossed the remaining charges. In support of this contention, appellant argues that,

by refusing to allow him to cross-examine the two State witnesses, the court violated his constitutional right to confront the witnesses against him regarding potential bias, interests, or motives.

Appellant's final contention is that the court erred in denying his motion to suppress the pre-trial photograph identification of Mr. Kelly. Appellant argues that the array was impermissibly suggestive because appellant was the only person appearing in the array wearing clothing matching the description given by Mr. Kelly.

The State contends that the court's flight instruction was proper because it was supported by the evidence, specifically, Officer Mundy's testimony.

Secondly, the State argues that the court properly prohibited appellant's counsel from eliciting testimony that appellant had previously been acquitted of assaulting Mr. Kelly and Mr. Beaver. In support of this contention, the State argues 1) that the court did in fact allow appellant to question Mr. Kelly and Mr. Beaver extensively regarding their testimony at prior hearings and about their prior statements to police, and 2) that the court properly determined that evidence of the prior acquittals was not relevant.

Finally, the State contends that appellant's motion to suppress was not preserved, or alternatively, that the pretrial identification procedure was not impermissibly suggestive because Mr. Kelly identified appellant based not only on the white t-shirt, but also on appellant's facial features.

### Discussion

### I. *Flight Instruction*

The evidence of flight consisted of Officer Mundy's testimony, quoted above, and the redacted taped statement by appellant, also quoted above. It is helpful to begin with what appellant does not contend. Appellant does not contend that the evidence was insufficient to support a flight instruction and does not contend that the instruction was an inaccurate statement of Maryland law. Rather, appellant contends that

the court erred in instructing the jury with respect to appellant's flight from the scene of the crime. Appellant argues that the knowledge by the parties and the court that appellant, in his statement to police, said he ran because he was "dirty," when considered with the evidence, "did not support a rational inference that [appellant] was guilty of the shootings based on his flight because it was at least as likely that he fled because he had a substantial amount of cocaine on his person."

Appellant also argues that the "other crimes" evidence, relating to possession of a controlled dangerous substance, was inadmissible, and appellant could not waive his objection or admit the evidence because it would have been highly prejudicial. In support of his contention, appellant, citing no Maryland cases, relies on decisions in other jurisdictions, primarily the State of Mississippi. After reviewing Maryland law, we conclude that the trial court did not err.

A person's behavior after the commission of a crime may be admissible as circumstantial evidence of guilt. *Thomas v. State*, 372 Md. 342, 351, 812 A.2d 1050 (2002). This includes flight. *See, e.g., Sorrell v. State*, 315 Md. 224, 554 A.2d 352 (1989), *Hunt v. State*, 312 Md. 494, 540 A.2d 1125 (1988). Flight by itself, however, is not sufficient to establish guilt, but is a circumstance to be considered with other factors as tending to show a consciousness of guilt and therefore guilt. *Sorrell*, 315 Md. at 227, 554 A.2d 352. Evidence which weakens the inference of guilt from flight does not render evidence of flight inadmissible but is instead to be considered by the jury. *Id.* at 228, 554 A.2d 352; *Bedford v. State*, 317 Md. 659, 566 A.2d 111 (1989). Flight includes flight from the scene of a crime. *Sorrell*, 315 Md. at 228, 554 A.2d 352.

In *Thomas*, the Court of Appeals quoted from *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977), for the proposition that there are four inferences, the strength of which determine the probative value of evidence of flight. The inferences are: 1) from the defendant's behavior to flight; 2) from flight to consciousness of guilt; 3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and 4) from

consciousness of guilt concerning the crime charged to actual guilt of the crime charged. *Thomas,* 372 Md. at 352, 812 A.2d 1050. In the context of the third prong, the Court of Appeals emphasized that it is important to connect a defendant's consciousness of guilt to a consciousness of guilt for the specific crime charged. *Id.* at 354, 812 A.2d 1050. The Court explained, however, that even though the evidence may show that the defendant committed other crimes, that is not a basis upon which to exclude the evidence, the point being that "the evidence must at least be connected to the crime charged." *Id.* at 354, n. 3, 812 A.2d 1050.

■ Pursuant to Maryland Rule 4–325(c), a trial court is required to give a requested jury instruction when 1) the instruction constitutes a correct statement of the law; 2) the instruction is applicable to the facts of the case; and 3) the content of the instruction was not fairly covered elsewhere in the instructions actually given. *Patterson v. State,* 356 Md. 677, 684, 741 A.2d 1119 (1999) (internal citations omitted). Furthermore, the requested instruction must be justified by the evidence. *See, e.g., Roach v. State,* 358 Md. 418, 428, 749 A.2d 787 (2000).

■ With regard to flight instructions, specifically Md. Pattern Jury Instructions—Criminal 3:24, quoted above, a court may give such an instruction where there is some evidence of flight or concealment immediately after the commission of a crime or after an accusation of the crime that has been committed. There must also be "other apparent circumstances upon which to base a reasonable assumption of guilt." *Young v. State,* 234 Md. 125, 130, 198 A.2d 91 (1964).

As mentioned above, there was evidence of flight from the scene consisting of the testimony of Officer Mundy and appellant's statement. Appellant's counsel successfully objected to the introduction of any evidence with respect to the 86 vials of cocaine found on appellant's person. Appellant also successfully objected to the portion of appellant's statement wherein he stated that he was dirty. That portion was redacted, but appellant did not object to the portion wherein he stated that

he ran. Much of appellant's argument relates more to the admissibility of flight evidence than to the giving of an instruction, and some of the unfairness perceived by appellant relates to the admissibility of a portion of his statement.

The question of admissibility is not before us, but we make the following observations. First, with respect to appellant's statement, such statements are generally admissible in their entirety. If the State offers a portion of a defendant's statement, the defendant has the right to have the entire statement admitted, including exculpatory portions. *See* MD. R. EVID. 5–106. If the statement contains information relating to other crimes or bad acts, *see* MD. R. EVID. 5–404(b), the defendant may seek to have those excluded, and while exclusion is not automatic, they likely will be excluded, if not otherwise relevant, or if not inextricably intertwined with the inculpatory portion. In the case before us, had appellant objected to the portion of the statement wherein appellant said he ran, an objection may well have been sustained. The statement that he ran, standing alone, is out of context. In context, it is not inculpatory with respect to the crimes charged.

Another possibility is that, had an objection been made, the parties by agreement or the court by ruling may have arrived at a middle ground in terms of letting the jury know that appellant stated he ran, but for some reason other than guilt of the crimes charged. Under no circumstances, as appellant suggests, was he compelled to introduce evidence that 86 vials of cocaine were found on his person in order to get before the jury an express reason as to why he ran. Regardless, the bottom line is that the evidence of flight came in through appellant's statement and Officer Mundy's testimony, the evidence is unchallenged, and it may be considered for all purposes.

With respect to admissibility of flight evidence generally, virtually all jurisdictions admit it, assuming it meets the general requirements for admissibility. *See, e.g., Sorrell,* 315 Md. at 227, 554 A.2d 352 ("Evidence of flight following a crime has generally been held admissible to show consciousness of

guilt in Maryland."). The Court of Appeals has recognized that certain courts have criticized the admissibility of flight evidence, but it has continued to favor admissibility when there is a connection to the crime charged and it is otherwise sufficiently probative. *See Thomas,* 372 Md. at 353–54, 812 A.2d 1050; *Hunt,* 312 Md. at 508–09, 540 A.2d 1125. Under the law of Mississippi, as cited by appellant, evidence of flight is not admissible whenever a reason exists, other than consciousness of guilt of the crime charged, that would explain it. As we understand Maryland law, that rule has not been adopted here. *See Bedford v. State,* 317 Md. 659, 566 A.2d 111 (1989).

In the case before us, regardless of whether the portion of appellant's statement indicating that he ran was admitted or not admitted, the evidence of flight was sufficient to support the instruction. The significance of appellant's statement, in the context of the issues before us, is that it contained an assertion by appellant that he ran for a reason other than (or perhaps in addition to) consciousness of guilt for the crimes charged. The court's knowledge of this assertion is of no consequence, however, because a contrary conclusion would be inconsistent with giving a flight instruction in any case, even though there was evidence of flight and a connection to the crime charged. Unless a defendant admits guilt, a court will always assume that a defendant may offer evidence of a reason for the flight that is consistent with innocence or inconsistent with guilt for the crimes charged and, if so, will argue the reason to the jury. In the absence of such evidence, the court will assume that the defendant will argue to the jury, as permitted by the jury instruction, that flight was motivated by factors consistent with innocence.

The essence of appellant's position constitutes an attack on the giving of a flight instruction under any circumstances. We acknowledge that, under the law in several jurisdictions, such instructions either may not be given or are frowned upon. The reason frequently given is that it is unnecessary and emphasizes certain evidence. Those courts are of the view that a general instruction on circumstantial evidence is suffi-

cient and the question of flight should be addressed through arguments of counsel. *See, e.g., Dill v. State,* 741 N.E.2d 1230 (Ind.2001); *State v. Hall,* 297 Mont. 111, 991 P.2d 929, 937 (1999). This is not a new concept and has been around for many years, but it has not been adopted in this state.

### III. *Previous Acquittals*

■ During the second trial, appellant wished to cross-examine Mr. Beaver and Mr. Kelly regarding the disposition of the previous trial, *i.e.,* that appellant had been acquitted of assaulting them and that the State had declined to pursue the remaining charges, in an effort to show that perhaps they were now biased in their testimony, or had some motive to lie. The court ruled that the disposition of the prior charges was irrelevant; however, the court permitted appellant to cross-examine Mr. Beaver and Mr. Kelly with respect to their prior testimony in an effort to impeach them.

■ It is well-settled that "the admission of evidence is committed to the considerable and sound discretion of the trial court." *Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432 (1997). All evidence that is relevant, *i.e.,* has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, is admissible. *See* MD. R. EVID. 5–401, 5–402. Conversely, evidence that is not relevant is not admissible. MD. R. EVID. 5–402. A trial court's exclusion of evidence based on lack of relevancy should not be disturbed unless the finding was an abuse of discretion. *Tuer v. McDonald,* 112 Md.App. 121, 136, 684 A.2d 478 (1996), *aff'd,* 347 Md. 507, 701 A.2d 1101 (1997).

Appellant urges us to rely on *Smallwood v. State,* 320 Md. 300, 577 A.2d 356 (1990), in support of his proposition that the court erred in refusing to allow him to cross-examine Mr. Beaver and Mr. Kelly on matters affecting bias, interest, or motive to falsify. For the reasons set forth below, we conclude that *Smallwood* is distinguishable from the case at bar.

 Preliminarily, we recognize that the Sixth Amendment to the United States Constitution[4] guarantees an accused in a criminal proceeding the right to be confronted with the witnesses against him. *Pantazes v. State*, 376 Md. 661, 680, 831 A.2d 432 (2003). This right of confrontation includes the right to cross-examine a witness about matters which affect the witness's bias, interest, or motive to testify falsely. *Marshall v. State*, 346 Md. 186, 192, 695 A.2d 184 (1997) (citations omitted). The right to cross-examine is not without limits, however, and trial judges retain wide latitude to impose reasonable limits on cross-examination, *e.g.*, the evidence is not relevant.

In *Smallwood*, the defendant was charged with stealing clothing from a man who was delivering it to The Gap, a retail clothing store, in April 1987. *Smallwood, supra*, 320 Md. at 302, 577 A.2d 356. At trial, Smallwood's ex-girlfriend testified against him, stating that, in April 1987, Smallwood gave her clothing that still bore price tags from The Gap. *Id.* On cross-examination, defense counsel attempted to elicit from the ex-girlfriend that Smallwood had been previously acquitted of two charges of assaulting her. The court found these prior acquittals to be irrelevant and prevented defense counsel from eliciting this information. *Id.* at 302–03, 577 A.2d 356.

On appeal, the Court of Appeals characterized the defense's purpose in trying to elicit the prior acquittals as an attempt "to demonstrate for the jury that the witness's motivation for testifying as she did in the instant case stemmed from her failure to obtain convictions in the previous cases." *Id.* at 304, 577 A.2d 356. Thus, the Court concluded that the evidence was relevant toward "revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to the issues or personalities in the case at hand." *Id.* at 309, 577 A.2d 356 (*quoting Davis v. Alaska*, 415 U.S. 308, 316–17, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).

---

4. *See* Article 21 of the Maryland Declaration of Rights.

In *Smallwood,* the potential bias of Smallwood's ex-girl-friend was relevant based primarily on the prior relationship between the witness and the defendant and on the fact that the witness had previously attempted to bring unrelated charges against the defendant. In the case before us, there was no prior relationship between appellant and the two witnesses. Further, the prior proceeding arose from the incident for which appellant was on trial and the witnesses' testimony involved the same underlying facts.

Unlike the situation in *Smallwood,* in the present case, any alteration of the witnesses' testimony from the first trial to the second trial could properly be highlighted through cross-examination, and the record shows that the court properly allowed appellant to cross-examine the witnesses in this regard; thus, there was no need to put before the jury evidence that appellant was acquitted of assaulting Mr. Beaver and Mr. Kelly. During cross-examination, however, appellant failed to elicit any demonstrable contradictions between their testimony that would support an argument of bias, interest, or motive on the part of the witnesses. We decline to find an abuse of discretion.

## IV. *Motion to Suppress*

At the outset, we note that we disagree with the State's contention that the issue of Mr. Kelly's pretrial identification was not preserved for our review. Pursuant to Maryland Rule 4–252(h)(2)(B), "[i]f the court denies a motion to suppress evidence, the ruling is binding at the trial unless the court, on the motion of a defendant and in the exercise of its discretion, grants a supplemental hearing or a hearing de novo and rules otherwise." *See also Logue v. State,* 282 Md. 625, 628, 386 A.2d 780 (1978) ("When such a motion has been fully heard and considered and there is not new evidence which was unavailable at the first hearing, the trial court may exercise his discretion and bind himself by the prior ruling whether the proceeding is in the original trial or a new trial.").

In the present case, a motions hearing was held prior to the first trial. At that hearing, appellant argued that the photo-

graphic array in which appellant was identified by Mr. Kelly was obtained through unnecessarily suggestive procedures, therefore appellant's constitutional right to due process was violated. The suppression court, stating that appellant did not meet his burden of showing that the pretrial procedure was impermissibly suggestive, denied appellant's motion to suppress. On appeal, the State argues that, at the suppression hearing prior to the second trial, appellant's arguments regarding suppression of the photographic array were not based on the same due process grounds as at the suppression hearing before the first trial. Thus, the State contends, appellant has waived his right to argue the constitutional issue on appeal. Our review of the record, however, indicates that there was not a new motion to suppress the photographic array based on Mr. Kelly's pretrial identification prior to the second trial. Rather, appellant's motion to suppress prior to the second trial was based on whether Mr. Gottesman made a pretrial identification of appellant on the night of the shooting. Thus, Maryland Rule 4–252(h)(2)(B) applies.

We now turn to appellant's contention that the court erred by not suppressing Mr. Kelly's pretrial identification of appellant because the photo array was impermissibly suggestive.

Preliminarily, we note that, on appeal, we must extend great deference to the fact-finding of the suppression court with respect to determining the credibility of witnesses and to weighing and determining first-level facts. *McDuffie v. State,* 115 Md.App. 359, 366, 693 A.2d 360 (1997) (*citing Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990)). After reviewing the testimony of Detective Debord and weighing the evidence before it, the suppression court found that there was nothing unduly suggestive in the photographic array. Although we must make an independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case, *Gatewood v. State,* 158 Md.App. 458, 476, 857 A.2d 590 (2004), aff'd on other grounds, 388 Md. 526, 880 A.2d 322 (2005), we conclude that

the trial court did not err in finding that the procedure used was not impermissibly suggestive.

■■■■■■ The Due Process Clause of the 14th Amendment to the United States Constitution protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures. *Moore v. Illinois*, 434 U.S. 220, 227, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *see Jones v. State*, 310 Md. 569, 577, 530 A.2d 743 (1987), *vacated on other grounds*, 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988). The accused, in challenging introduction of pretrial identifications that were obtained through suggestive procedures, bears the initial burden of showing that the procedure employed to obtain identification was unduly suggestive; *Thomas v. State*, 139 Md.App. 188, 208, 775 A.2d 406 (2001), *aff'd*, 369 Md. 202, 798 A.2d 566 (2002). To do something impermissibly suggestive is to feed the witness clues as to which identification to make. *Conyers v. State*, 115 Md.App. 114, 121, 691 A.2d 802, *cert. denied*, 346 Md. 371, 697 A.2d 111 (1997). Suggestiveness "exists where in effect, the police repeatedly said to the witness, 'This is the man.'" *McDuffie, supra*, 115 Md.App. at 366, 693 A.2d 360 *quoting Jones, supra*, 310 Md. at 577, 530 A.2d 743). "THE SIN IS TO CONTAMINATE THE TEST BY SLIPPING THE ANSWER TO THE TESTEE. All other improprieties are beside the point." *Id.* (Emphasis in original). It is only after the accused has overcome this burden that the State must prove, by clear and convincing evidence, that independent reliability in the identification outweighs the "corrupting effect of the suggestive procedure." *Gatewood, supra*, 158 Md.App. at 475, 857 A.2d 590 (*quoting Thomas, supra*, 139 Md.App. at 208, 775 A.2d 406) (citations omitted)).

Appellant claims that the photographic array shown to Mr. Kelly was impermissibly suggestive because only appellant was wearing a white t-shirt, the clothing that matched Mr. Kelly's prior description. Furthermore, Detective Debord testified at the suppression hearing that Mr. Kelly made mention of the white t-shirt at the time of making his identifi-

cation. However, the court concluded, after hearing testimony and viewing the evidence, that two of the photos in the array depicted people in white t-shirts, and one photo depicted a person in a white t-shirt with a jacket over it. More importantly, Mr. Kelly did not identify appellant only by the t-shirt, but rather indicated that he recognized appellant from his facial features. We cannot conclude, therefore, that appellant has demonstrated the level of suggestiveness necessary to carry his burden. Thus, we shall not reach the reliability prong of the inquiry.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**